# EXHIBIT 1

1

2

3

4  Yuriy B. Mankovskiy, Pro Se
5  75 Brook Farm Road
   West Roxbury, MA 02132
6  617-323-8005
   ybman@comcast.net
7

8       IN THE SUPERIOR COURT OF THE STATE OF MASSACHUSETTS
9                          COUNTY OF SUFFOLK

10

| 11 | YURIY B. MANKOVSKIY PRO SE, | Case No.: |
|----|----|----|
| 12 | Plaintiff, | |
| 13 | vs. | PLAINTIFF'S COMPLAINT FOR: LACK OF STANDING TO FORECLOSE, FRAUD IN THE CONCEALMENT, FRAUD IN THE INDUCEMENT, UNCONSCIONABLE CONTRACT, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, QUIET TITLE, TEMPORARY RESTRAINING ORDER/INJUNCTIVE RELIEF |
| 14 | | |
| 15 | WORLD SAVINGS BANK, FSB; WORLD SAVINGS BANK, FSB, THE BANK OF NEW YORK MELLON AS TRUSTEE FOR SECURITIZED TRUST WORLD SAVINGS BANK MORTGAGE PASS - THROUGH CERTIFICATES REMIC 15 TRUST, WORLD SAVINGS BANK, FSB, AND DOES 1 THROUGH 100 INCLUSIVE, *et al.* | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | Defendants | |

21

22

23  **PLAINTIFF'S COMPLAINT FOR: LACK OF STANDING TO FORECLOSE, FRAUD
    IN THE CONCEALMENT, FRAUD IN THE INDUCEMENT, UNCONSCIONABLE
24  CONTRACT, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, QUIET
    TITLE, TEMPORARY RESTRAINING ORDER/INJUNCTIVE RELIEF**

25

COMES NOW the Plaintiff, Yuriy B. Mankovskiy, Pro se ("Plaintiff"), complaining of the Defendants as named above, and each of them, as follows:

## JURISDICTION

1. Venue is proper in Suffolk County, as the actions complained of occurred in Suffolk County. This Court has jurisdiction over this matter pursuant to the State Constitution and statute.

## THE PARTIES

2. Plaintiff is now, and at all times relevant to this action, a resident of the County of Suffolk, State of Massachusetts.

3. At all times relevant to this action, Plaintiff owned and has superior claim to the Real Property (the "Home") located at 75 Brook Farm Road, West Roxbury, MA 02132.

4. Defendant, World Savings Bank, FSB is a National Banking Association, a Non-Depository Payor Bank doing business in the County of Suffolk, State of Massachusetts. Plaintiff is further informed and believes, and thereon alleges, that World Savings Bank, FSB is the account debtor of the instant matter in a capacity of accommodated party in interest to a 26 U.S. Code § 1031– Exchange of property held for productive use or investment warehouse line of credit, here after more particularly described in this Complaint.

5. Defendant World Savings Bank, FSB is a corporation, doing business in the County of Suffolk, State of Massachusetts. Defendant is the "Sponsor/Seller" for bankruptcy remote Special Purpose Vehicle WSB REMIC 15 Trust. Plaintiff is further informed and believes, and thereon alleges that Defendant World Savings Bank, FSB was acting in the capacity of a qualified intermediary for credit swap conveyances associated to the 26 U.S. Code § 1031– Exchange of property held for productive use or investment warehouse line of credit, more particularly described in this Complaint.

6. Defendant Depositor, an as-of-yet unidentified corporation doing business in the County of Suffolk, State of Massachusetts. Defendant is the purported "Depositor" for bankruptcy remote Special Purpose Vehicle WSB REMIC 15 Trust. Plaintiff is further informed and believes, and thereon alleges that Defendant Depositor was acting in the capacity of a qualified intermediary for credit swap conveyances associated to the 26

U.S. Code § 1031 – Exchange of property held for productive use or investment warehouse line of credit, more particularly described in this Complaint.

7. Defendant, The Bank of New York Mellon, acting in the capacity of Trustee for the bankruptcy remote Special Purpose Vehicle World Savings Bank Mortgage Pass - Through Certificates REMIC 15 (herein referred to as "WSB REMIC 15 Trust" is a National Banking Association, doing business in the County of Suffolk, State of Massachusetts. Plaintiff is informed and believes, and thereon alleges that Defendant The Bank of New York Mellon acting in the capacity as Junior Secured Party to World Savings Bank, FSB in the special purpose vehicle (SPV) transaction scheme is offering securities to the secondary market for the purpose of obtaining certificate holder's acquired funds by Special Deposit to execute a 26 U.S. Code § 1031– Exchange of property held for productive use or investment warehouse line of credit, more particularly described in this Complaint. (Exhibit F) Special Purpose Vehicle Patent.

8. Plaintiff does not know the true names, capacities, or basis for liability of Defendants sued herein as Does 1 through 100, inclusive, as each fictitiously named Defendant is in some manner liable to Plaintiff, or claims some right, title, or interest in the Property. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained through discovery. Plaintiff is informed and believe, and therefore allege that at all relevant times mentioned in this Complaint, each of the fictitiously named Defendants are responsible in some manner for the injuries and damages to Plaintiff so alleged and that such injuries and damages were proximately caused by such Defendants, and each of them.

9. Plaintiff is informed and believes, and thereon alleges that at all times herein mentioned, each of the Defendants were the agents, employees, servants and/or the joint-ventures of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

## GENERAL ALLEGATIONS

10. This is an action brought by Plaintiff for declaratory judgment, injunctive and equitable relief, and for compensatory, special, general and punitive damages.

11. Plaintiff, homeowner, disputes Defendants' superior colorable claim to legal title and equitable title of the Prime Market Real Property in question (hereafter, the "Real Property"), which is the subject of this instant action, in so much that Plaintiff specifically pledged the Real Property collateral evidenced by the Grant Deed and further clarified under the Deed of Trust as Real Property to The Accommodated Non Depository Payor Bank World Savings Bank, FSB (hereafter, Accommodated Party) as Accommodation Party in the 26 U.S. Code §1031 – Exchange of property held for productive use or investment (hereafter, the "§1031 – Exchange"). Plaintiff is informed and believes, and thereon alleges that the Defendant WSB REMIC 15 as a Junior Secured Party to World Savings Bank, FSB in the §1031 – Exchange is attempting to make an unlawful claim to legal title through a fraudulent assignment of enforcement rights of the currently un-perfected underlying Deed of Trust and unlawful equitable claim to ownership to Plaintiff's Real Property through the World Savings Bank, FSB hypothecated collateral purported after acquired "proceeds" of the Real Property which through the Deed of Trust lien encumbering Plaintiff's Real Property; which, is being unlawfully construed as the Intangible Payment Obligation Transferable Record Chattel Paper (hereafter, the "Payment Intangible"), the underlying intangible collateral to the Tangible Note for Accommodation or Bill of Exchange (hereafter, the "Tangible Note"). (Exhibit A) Grant Deed (Exhibit B) Deed of Trust

12. From 1998 until the financial crash of 2008-2009, over 60 million purported consumer credit mortgage loan transactions were purportedly sold by Non-Depository Payor Banks to Special Purpose Vehicles (hereinafter "SPV") via 26 U.S. Code §1031 – Exchange of property held for productive use or investment (hereafter, the "§1031 – Exchange"). The Plaintiff's purported home loan was one of the 60 million scheduled to for exchange.

13. Plaintiff is informed and believes, and thereon alleges that a §1031 – Exchange is the mechanical transactional scheme whereby a purported Tangible Note is converted/exchanged for a Payment Intangible asset to provide an alternative investment offering via Special Deposit to certificate or bond holders which were expected to be relatively safe; which, were offered by Wall Street Firms to the secondary market

through purported mortgage backed securities. (Exhibit C) OCC Asset Securitization Manual 1997, Pg. 23



14. Plaintiff is informed and believes, and thereon alleges that, certain tax laws known as the Real Estate Mortgage Investment Conduit (hereafter, REMIC) Tax Reform Act of 1986 were to be observed, and whereby the Non-Depository Payor Banks and Issuing Entities REMIC would be protected from either entity going into bankruptcy. To achieve the desired "bankruptcy remoteness," purported numerous "True Sales" of Plaintiff's Tangible Note would have had to of occurred by operation of All applicable law.

15. Plaintiff is further informed and believes, and thereon allege that there was no "True Sale" of Plaintiff's Tangible Note, a circumstance whereby World Savings Bank, FSB sold Plaintiff's Tangible Note to the "buyer/seller" World Savings Bank, FSB **in an ordinary course of business** by offer, acceptance, delivery and consideration given for full value of the entire instrument. (Exhibit D) Real Estate and the Tax Reform Act of 1986.

16. The Accommodated Non Depository Payor Bank (hereafter, Accommodated Party) World Savings Bank, FSB, purports to have negotiated in accordance to all applicable law the Tangible Note obligation **in an ordinary course of business** to successor

defendant World Savings Bank, FSB; likewise, Plaintiff is informed and believes, and thereon alleges that World Savings Bank, FSB has unlawfully purported to assign, transfer, or convey account debtor capacity as Accommodated Party to World Savings Bank, FSB successor and successor defendants in consideration for a service release premium received for Accommodated Party services rendered for Originating the §1031 – Exchange on or before closing date of WSB REMIC 15 Trust. Plaintiff is informed and believes, and thereon alleges that World Savings Bank, FSB never negotiated the Tangible Note by operation of law for full value in accordance with all applicable law to World Savings Bank, FSB.

17. The Accommodated Party World Savings Bank, FSB, purports to have assigned/transfer a beneficial security interest over Plaintiff's Real Property evidenced by World Savings Bank, FSB recorded Deed of Trust lien **in an ordinary course of business** to successor defendants of the §1031 – Exchange.  Plaintiff is informed and believes, and thereon alleges that World Savings Bank, FSB never negotiated the Tangible Note Bill of Exchange for full value in accordance to all applicable law.  Plaintiff is further informed and believes, and thereon alleges that at best, World Savings Bank, FSB delivered  a converted (statutory conversion) an unsecured Tangible Note as "order paper" to World Savings Bank, FSB for settlement for Accommodated Party services rendered associated to originating the exchange transaction, **not in an ordinary course of business** and therefore, could not negotiate, assign, transfer the underlying security intangible beneficial security interest enforcement right over the power of sale covenant in the World Savings Bank, FSB currently un-perfected Deed of Trust lien encumbering Plaintiff's Real Property.

18. Plaintiff is further informed and believes, and thereon alleges that a payment for **full value of the entire instrument in an ordinary course of business** to World Savings Bank, FSB from World Savings Bank, FSB for the Tangible  Note for Accommodation at or before its maturity date destroys the Tangible Notes negotiability thus, no documents or records can be produced that demonstrate that prior to the April 7, 2004 closing date for WSB REMIC 15 Trust, the Tangible Note was duly indorsed, transferred and delivered to WSB REMIC 15 Trust **in an ordinary course of business** by operation

of all applicable law, including all intervening transfers including any purported transfers in the personal property Payment Intangible. Nor can any documents or records be produced that demonstrate that prior to the April 7, 2004, the Deed of Trust was duly assigned, transferred and delivered to WSB REMIC 15 Trust, via the Custodian of Records, The Bank of New York Mellon, including all Secret Liens purportedly securing the Payment Intangible intervening transfers/assignments.

19. Plaintiff further alleges that any documents that purport to transfer a hypothecated beneficial security interest over the Payment Intangible underlying collateral of the Tangible Note or Bill of Exchange to WSB REMIC 15 Trust after the Closing Date April 7, 2004 are void as a matter of law; no security interest in the Real Property was perfected in the name of any of the successor defendant to the §1031 - Exchange. The alleged holder of the Tangible Note is not the beneficiary of the Deed of Trust. The alleged beneficiary of Plaintiff's Deed of Trust does not have the requisite title, perfected security interest or standing to proceed in a foreclosure; and/or is not the real party in interest as agent or nominee to any action taken or to be taken against the Real Property by successor Defendants to the §1031 – Exchange.  Plaintiff is also informed and believes, and thereon alleges that at all times herein mentioned, any assignment of a Deed of Trust **without proper transfer** in an ordinary course of business of the Tangible Note that it secures is a legal nullity by operation of law. Plaintiff is informed and believes, and thereon alleges that the WSB REMIC 15 Trust had no officers or directors and no continuing duties other than to hold assets and to issue the series of certificates of SPV investment in mortgage backed securities.

20. Plaintiff alleges that Defendants, and each of them, cannot establish possession, show proper receipt, transfer, negotiations, assignment and ownership of the Tangible Note or Deed of Trust, resulting in imperfect security interests and claims; therefore, none of the Defendants have perfected any colorable claim of title or security interest in the Real Property. Defendants, and each of them, cannot establish that the Deed of Trust purportedly securing the Tangle Note, were legally or properly acquired in accordance to all applicable law. Plaintiff therefore alleges, upon information and belief, that none of the parties to the §1031 – Exchange transaction, nor any of the Defendants in this case,

hold a perfected and secured claim in the Real Property; and that all Defendants are equitably estopped and precluded from asserting an unsecured claim against Plaintiff's estate.

21. Plaintiff alleges that an actual controversy has arisen and now exists between Plaintiff and Defendants, and each of them. Plaintiff desires a judicial determination and declaration of its rights about the Real Property and the corresponding Tangible Note and Deed of Trust.

22. Plaintiff also seeks redress from Defendants identified herein for damages, for other injunctive relief, and for cancellation of written instruments based upon:
   a. An invalid and unperfected security interest in Plaintiff's Real Property hereinafter described;
   b. Void "True Sales;"
   c. An incomplete and ineffectual perfection of a security interest in Plaintiff's Real Property

## STATEMENT OF PERTINENT FACTS

23. Plaintiff had a Forensic Chain of Title Securitization Analysis completed by qualified expert in to verify the claims of this complaint. (Exhibit H) Affidavit of Michael Carrigan

24. Plaintiff is the Superior Recorded owner of the Prime Market Property. (Exhibit A) Grant Deed.

25. Plaintiff was issued an Uncertificated Security to execute in the capacity of (Accommodation Party) to a Tangible Note Bill of Exchange on March 8, 2004 regarding a purported loan to (Accommodated Party) World Savings Bank, FSB for $262,000.00.

26. Defendant World Savings Bank, FSB is an account debtor Accommodated Party to a 26 U.S. Code § 1031 – Exchange of property held for productive use or investment.

27. Plaintiff herein alleges that the signatures on the Tangible Note Bill of Exchange instrument as the Accommodation party constitutes a **statutory capacity as Surety** for the Non-Depository Payor Bank, the original Accommodated secured party of record, acting as Trustee/Account Debtor pursuant to a Special Deposit 26 U.S. Code§1031 – Exchange of property held for productive use or investment.

28. Plaintiff pledged a Constructive Deed of Trust granting Legal Title to Accommodate World Savings Bank, FSB to file against Plaintiff's Superior Claim to Title filed in the

Official Records of the Suffolk County Recorder's Office on March 12, 2004 as ins# 33995-0134. (Exhibit B) Deed of Trust.

29. The purported Mortgage loan contracts between the parties are specific as to the duties of each party.

30. Despite the fact that Plaintiff's Note and Mortgage was sold to the World Savings Bank Mortgage Pass-Through Certificates REMIC 15 Trust, there is no recorded assignment of interest in Plaintiff's Mortgage to Wachovia Bank, Wells Fargo Bank, NA or any other party necessary to perfect a security interest in the Note upon its sale.

31. Plaintiff alleges that only the Depositor, is the rightful party that can convey the asset into the trust pursuant to investor offering documents as filed with the Securities and Exchange Commission.

## PROPERTY

32. The Real Property description which is the subject of this suit is commonly known as 75 Brook Farm Road, West Roxbury, MA 02132.

## FIRST CAUSE OF ACTION:
## LACK OF STANDING/WRONGFUL FORECLOSURE

A.    **No Defendant Has Standing to Foreclose**

33. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

34. An actual controversy has arisen and now exists between Plaintiff and Defendants specified hereinabove, regarding their respective rights and duties, in that Plaintiff contends that Defendants, and each of them, do not have an equitable right to foreclose on the Property because Defendants, and each of them, have failed to perfect any security interest in the Real Property collateral, or cannot prove to the court they have a valid interest as a real party in interest to the underlying Deed of Trust. Thus, the purported power of sale, or power to foreclose non-judicially, by the above specified Defendants, and each of them, no longer applies.

35. Plaintiff requests this Court find that the purported power of sale contained in the Deed of Trust is a nullity by operation of law, because Defendants' actions in the processing, handling and attempted foreclosure of this §1031 - Exchange involved numerous

fraudulent, false, deceptive and misleading practices, including, but not limited to, violations of State laws designed to protect borrowers, which has directly caused Plaintiff to be at an equitable disadvantage to Defendants, and each of them. Plaintiff further requests that title to the Real Property remain in Plaintiff's name during the pendency of this litigation, and deem that any attempted sale of the Real Property is "unlawful and void".

36. Plaintiff is informed and believes, and thereon allege that to conduct a foreclosure action, a person or entity must have legal capacity as interested party and standing.

37. The Tangible Note in this action identifies the entity to whom it accommodated, the Originator. Therefore, the Tangible Note herein cannot be transferred **in an ordinary course of business**; the attachments to the notice of default do not establish that indorsements were made, nor are there any other notices which establish that Tangible Note negotiation was executed in an ordinary course of business, nor are there any other notices which establish that the Originator sold the Tangible Note to another party for full value.

38. Furthermore, insofar as the parties to the §1031 - Exchange of Defendant's purported transfer off enforcement contract rights over the underlying Deed of Trust base their claim that the Tangible Note and underlying Security was negotiated by operation of law in an ordinary course of business to Defendant The Bank of New York Mellon, the Trustee of the § 1031 - Exchange herein, by the Originator, it is well established State law that the assignment of a Deed of Trust does not automatically assign the Tangible Note nor the underlying Payment Intangible Transferrable Record as the security interest is incident of the Tangible Note debt obligation.

39. Pursuant to State law, one must be able to prove their capacity of holder of the Tangible Note as one with rights acquired in an ordinary course of business to perfect the transfer of enforcement contract rights to the Deed of Trust instrument as collateral for a Tangible Note debt obligation.   Without proper negotiation and physical transfer, the "true sale" of the Tangible Note is invalid as a fraudulent conveyance, or as an unsecured Tangible Note stripped fo the Real Property collateral.

40. Any attempt to transfer the beneficial interest of a trust deed without actual ownership of the underlying Tangible Note attached together in one with the underlying Payment Intangible Transferable Record, is void under law.   Therefore, Defendants cannot establish that it is entitled to assert a claim in this case.  For this reason, as well as the other reasons set forth herein below, Defendants cannot transfer an interest in Real Property, and cannot recover anything from Plaintiff with unclean hands.

41. Defendants, and each of them, through the actions alleged above, claim the right to illegally commence foreclosure sale of Plaintiff's Real Property under the Deed of Trust on the Real Property via an *in Rem* action supported by false or fraudulent documents. Said unlawful foreclosure action has caused and continues to cause Plaintiff great and irreparable injury in that Real Property is unique.

42. The wrongful conduct of the above specified Defendants, and each of them, unless restrained and enjoined by an Order of the Court, will continue to cause great and irreparable harm to Plaintiff. Plaintiff will not have the beneficial use and enjoyment of the Home and will lose the Property.

43. Plaintiff has no other plain, speedy or adequate remedy and the injunctive relief prayed for below is necessary and appropriate to prevent irreparable loss to Plaintiff. Plaintiff suffered and will continue to suffer unless Defendants' wrongful conduct is restrained and enjoined because Real Property is inherently unique and it will be impossible for Plaintiff to determine the precise amount of damage it will suffer.

### SECOND CAUSE OF ACTION
### FRAUD IN THE CONCEALMENT

### (Against Defendant World Savings Bank, FSB)

44. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

45. Generally, one must prove the following to bring a legally sufficient claim of Fraudulent Concealment.

    a.        Concealed or suppressed a material fact;
    b.        Had knowledge of this material fact;

regarding the true capacity of the parties and material facts of the purported loan and that most importantly, it created no indebtedness underlying obligation between the Defendants and other parties to the § 1031 – Exchange.

48. Defendant World Savings Bank, FSB knew or should have known that had the truth been disclosed, Plaintiff would not have pledged a security agreement to World Savings Bank, FSB the Accommodated Party as an alternate means of collection.

49. Defendant World Savings Bank, FSB intended to induce Plaintiff based on these material misrepresentations and improper disclosures.

50. Plaintiff's reasonable reliance upon the misrepresentations was detrimental. But for failure to disclose the true and material terms of the transaction, Plaintiff could have been alerted to issues of concern. Plaintiff would have known of Defendant's true intentions and profits from the proposed purported loan. Plaintiff would have known that the actions of Defendant World Savings Bank, FSB would have an adverse effect on the value of Plaintiff's home by clouding the title.

51. Defendant's failure to disclose the material terms of the transaction induced Plaintiff to enter the §1031 – Exchange purported loan and accept the Services as Accommodated Party herein.

52. Defendants were aware of the misrepresentations and profited from them.

53. As a direct and proximate result of the misrepresentations and concealment, Plaintiff was damaged in an amount to be proven at trial, including but not limited to costs of the loan, damage to Plaintiff's financial security, emotional distress, mental anguish, and Plaintiff incurred costs and attorney's fees.

54. Defendant World Savings Bank, FSB is guilty of malice, fraud and/or oppression. Defendants' actions were malicious and done willfully in conscious disregard of the rights and safety of Plaintiff in that the actions were calculated to injure Plaintiff. As such, Plaintiff is entitled to recover in addition to actual damages, punitive damages to punish Defendant and to deter them from engaging in future misconduct.

### THIRD CAUSE OF ACTION
### FRAUD IN THE INDUCEMENT

55. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

regarding the true capacity of the parties and material facts of the purported loan and that most importantly, it created no indebtedness underlying obligation between the Defendants and other parties to the § 1031 – Exchange.

48. Defendant World Savings Bank, FSB knew or should have known that had the truth been disclosed, Plaintiff would not have pledged a security agreement to World Savings Bank, FSB the Accommodated Party as an alternate means of collection.

49. Defendant World Savings Bank, FSB intended to induce Plaintiff based on these material misrepresentations and improper disclosures.

50. Plaintiff's reasonable reliance upon the misrepresentations was detrimental. But for failure to disclose the true and material terms of the transaction, Plaintiff could have been alerted to issues of concern. Plaintiff would have known of Defendant's true intentions and profits from the proposed purported loan. Plaintiff would have known that the actions of Defendant World Savings Bank, FSB would have an adverse effect on the value of Plaintiff's home by clouding the title.

51. Defendant's failure to disclose the material terms of the transaction induced Plaintiff to enter the §1031 – Exchange purported loan and accept the Services as Accommodated Party herein.

52. Defendants were aware of the misrepresentations and profited from them.

53. As a direct and proximate result of the misrepresentations and concealment, Plaintiff was damaged in an amount to be proven at trial, including but not limited to costs of the loan, damage to Plaintiff's financial security, emotional distress, and Plaintiff incurred costs and attorney's fees.

54. Defendant World Savings Bank, FSB is guilty of malice, fraud and/or oppression. Defendants' actions were malicious and done willfully in conscious disregard of the rights and safety of Plaintiff in that the actions were calculated to injure Plaintiff. As such, Plaintiff is entitled to recover in addition to actual damages, punitive damages to punish Defendant and to deter them from engaging in future misconduct.

### THIRD CAUSE OF ACTION
### FRAUD IN THE INDUCEMENT

55. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

56. Defendants, intentionally misrepresented to Plaintiff that Defendants were entitled to exercise the power of sale provision contained in the Deed of Trust. In fact, Defendants were not entitled to do so and have no legal, equitable, or actual beneficial interest whatsoever in the Property.

57. Defendants misrepresented that they are the "holder and owner" of the Tangible Note and the beneficiary of the Deed of Trust. However, this was not true and was a misrepresentation of material fact. Documents state that the Originator allegedly sold the mortgage loan instrument to WSB REMIC 15 Trust. Defendants are attempting to collect on an intangible debt obligation via the §1031 – Exchange to which they have no legal, equitable, or pecuniary interest relating to Plaintiff's Real Property. This type of conduct is outrageous. Defendants are fraudulently foreclosing on the Real Property, which they have no monetary or pecuniary interest, and doing so with unclean hands.

58. Defendants' failure to disclose the material terms of the transaction induced Plaintiff to enter the §1031 – Exchange and accept the Accommodated Services as alleged herein.

59. The material misrepresentations were made by Defendants with the intent to cause Plaintiff to reasonably rely on the misrepresentation to induce Plaintiff to submit to the foreclosure on the Real Property as opposed to recovering from predecessors in the § 1031 – Exchange on the Payment Intangible Obligation.

60. Defendants were aware of the misrepresentations and profited from them.

61. As a direct and proximate result of the misrepresentations and concealment, Plaintiff was damaged in an amount to be proven at trial, including but not limited to costs of the loan, damage to Plaintiff's financial security, emotional distress, mental anguish, and Plaintiff incurred costs and attorney's fees.

62. Defendants are guilty of malice, fraud and/or oppression. Defendants' actions were malicious and done willfully in conscious disregard of the rights and safety of Plaintiff in that the actions were calculated to injure Plaintiff. As such Plaintiff is entitled to recover in addition to actual damages, punitive damages to punish Defendants and to deter them from engaging in future misconduct.

## FOURTH CAUSE OF ACTION
## UNCONSIONABLE CONTRACT

### (Against Defendant World Savings Bank, FSB - WSB REMIC 15)

63. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

64. The actions of Defendants as set forth herein, resulted in Plaintiff being forced, tricked, and mislead into parting with their property.

65. Generally, one must prove the following to bring a legally sufficient claim of Unconscionable Contract.

    g.      Undue Influence;

    h.      Duress;
    i.       Unequal Bargaining Power;
    j.      Unfair Surprise; and
    k.      Limited Warranty

66. Defendant World Savings Bank, FSB presented in the origination of the purported loan that specific criteria such as FICO score and other industry standard underwriting requirements must be met to qualify for a loan of money for the subject property from World Savings Bank, FSB.

67. Defendant World Savings Bank, FSB presented in the origination of the purported loan that a preliminary signature on the Mortgage loan contract was required to "lock in" an interest rate regarding the terms of the purported loan.

68. Defendant World Savings Bank, FSB failed to clarify in the terms of the Mortgage loan contract that World Savings Bank, FSB, the Originator on the contract, was in fact acting solely in the capacity as Accommodated Party account debtor beneficiary for a purported loan of money.  World Savings Bank, FSB concealed they were financially benefitting by bargaining with a third party to acquire a service release premium via wire funds transfer to table fund the purported loan at the closing using a warehouse line of credit.

69. Defendant World Savings Bank, FSB knew or should have known that through a consciousness of innocence Plaintiff was at a special disadvantage when attempting to grant an alternate means of collection via the Security Instrument real property lien Mortgage to World Savings Bank, FSB.

70. Defendant World Savings Bank, FSB intended to exploit Plaintiff's special disadvantage and deny Plaintiff's superior rights to the subject property.

## FIFTH CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against Defendant World Savings Bank, FSB)

71. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

72. The terms of the mortgage contract are clear.

73. Pursuant to paragraph 23 – Release, Defendant World Savings Bank, FSB was obligated to satisfy, release and reconvey the beneficial security interest in Plaintiff's pledged Deed of Trust upon payment of all sums associated with the release premium to World Savings Bank, FSB for Accommodated Party services rendered.

74. Defendant World Savings Bank, FSB was paid in full for their Accommodated capacity to the Tangible Note and Deed of Trust when it sold and relinquished its interest in Plaintiff's real property to Depositor.

75. Defendant World Savings Bank, FSB failed to satisfy, release and reconvey the security instrument, thus breaching the terms found in paragraph 23 of the Deed of Trust.

## SIXTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

76. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

77. Generally, one must prove the following to bring a legally sufficient claim of Breach of Fiduciary Duty.

    a.       Breach of full disclosure;
    b.       Breach of good faith and fair dealing;
    c.       Misuse of superior or influential position;
    d.       Misuse of superior knowledge; and
    e.       Failure to act in another's best interest

78. Defendant World Savings Bank, FSB failed to disclose to Plaintiff that they were not the legitimate creditor but more accurately, were account debtor in the accommodated table

funded 26 U.S. Code § 1031 – Exchange of property held for productive use or investment to WSB REMIC 15.

79. Defendant World Savings Bank, FSB as beneficiary under the Mortgage having only an Accommodated personal property interest over the Real Property collateral failed to meet their fiduciary duty to satisfy, release and reconvey the Real Property Lien Deed of Trust and the beneficial security interest (personal property) therein after receiving payment for all sums represented as the service release premium

80. After March 8, 2004, and unknown to Plaintiff, Defendant World Savings Bank, FSB for payment rendered through a service release premium divested itself of their capacity under Accommodated Note but, did not comply with the covenants of the Deed of Trust specifically, Covenant 23 – Release.

81. World Savings Bank, FSB's acting not in the best interest of the grantor of the Deed of Trust failed to adhere to their Fiduciary Duties. Defendant World Savings Bank, FSB was to satisfy, release and reconvey the security instrument allowing Plaintiff to maintain clear and marketable title. Because of its failure to comply with the Mortgage, Defendants caused a cloud on Plaintiff's superior claim to title. Thus, Plaintiff was harmed.

### SEVENTH CAUSE OF ACTION
### QUIET TITLE

82. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

83. All Defendants named herein claim an interest and estate in the property adverse to Plaintiff in that Defendant asserts it is the owner of the note secured by the Deed of Trust to the property the subject of this suit.

84. All Defendants named herein claims an interest and estate in the Real Property adverse to Plaintiff in that Defendants' asserts to be the owner of Tangible Note secured by the Deed of Trust to the Real Property, the subject of this suit.

85. The claims of all Defendants are without any legal right whatsoever, and Defendants have no estate, title, lien or interest in or to the Real Property, or any part of the Real Property construed and hypothecated as "After Acquired Collateral" the Intangible Payment transferable record to the §1031 - Exchange.

86. The claim of all Defendants herein named, and each of them, claim some estate, right, title, lien or interest in or to the property adverse to Plaintiff's title, and these claims constitute a cloud on Plaintiff's title to the Real Property.

87. Plaintiff, therefore alleges upon information and belief, that none of the parties to the §1031 - Exchange transaction, nor any of the Defendants in this case hold a perfected and secured claim in the Real Property; and that all Defendants are estopped and precluded from asserting an unsecured claim against Plaintiff's Real Property Estate.

88. Plaintiff requests the decree permanently enjoining Defendants, and each of them, and all persons claiming under them, from asserting any adverse claim to Plaintiff's title to the property; and

89. Plaintiff requests the court award Plaintiff's costs of this action, and such other relief as the court may deem proper.

**EIGHTH CAUSE OF ACTION**
**TEMPORARY RESTRAINING ORDER AND FOR INJUNCTIVE RELIEF**

90. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

91. Plaintiff is the record title holder of the Property, and is now being threatened with irreparable injury by the conduct of Defendants.

92. Plaintiff will continue to be in jeopardy of injury by the Defendants' wrongful conduct by the now threatened foreclosure sale, causing irreparable injury by denying him the right to maintain the status quo between the parties pending resolution of the present dispute.

93. Plaintiff has no adequate remedy at law for both the factual and threatened injuries herein described. Plaintiff's real property residence and rights involved are non-fungible and utterly unique so that it will be impossible to accurately measure in monetary terms, the damage caused by Defendants' wrongful conduct.

94. Defendants' numerous violations of federal and state statutes and inability to establish a claim of right to Plaintiff's Note or Deed of Trust establishes Plaintiff's claim as more probable than not and Plaintiff will likely prevail at the time of trial.

95. Plaintiff requests that Defendants and its agents and employees be enjoined from prosecuting any continuance of a foreclosure sale pending trial.

## NINTH CAUSE OF ACTION
## DECLARATORY RELIEF

96. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

97. An actual controversy has arisen and now exists between Plaintiff and Defendants specified hereinabove regarding Plaintiff's respective rights and duties in the subject note and security instrument. Plaintiff requests a judicial determination of the rights, obligations and interest of the parties regarding the subject property, and such determination is necessary and appropriate under the circumstances so that all parties may ascertain and know their rights, obligations and interests regarding the subject property.

98. Plaintiff should be the equitable owner of the Subject Property.

99. Plaintiff seeks to quiet title as of the date of the filing of this Complaint. Plaintiff seeks a judicial declaration that the title to the Subject Property is vested in Plaintiff alone and that the Defendants be declared to have no interest estate, right, title or interest in the subject property and that the Defendants, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in the Subject Property subject to Plaintiff's rights.

## PRAYER

WHEREFORE PREMISES CONSIDERED as Prayer for Relief, and for the foregoing reasons, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon final hearing, Plaintiff be awarded judgment:

• Declaring that Defendants lack any interest in the subject property which would permit them to foreclose, evict, or attempt to foreclose or evict, the trust deed and/or to sell the subject properties;

• Declaring that the trust deed is not a lien against the subject properties, ordering the immediate release of the trust deed of record, and quieting title to the subject properties in Plaintiff and against Defendants and all claiming by, through or under them;

- • A refund of any wrongfully or improperly collected fees and payments to Defendants to which it had no right;

- • Pre- and post-judgment interest at the maximum rate allowed by law;

- • Attorney's fees;

- • Monetary relief over $100,000 but not more than $2,000,000,00; and

- • Such other and further relief at law and/or in equity to which Plaintiff may be justly entitled including but not limited to damages within the jurisdictional limits of this Court, together with pre-judgment and post-judgment interest as are allowed by law.

Dated: April __7th, 2017.

Yuriy B. Mankovskiy, Pro Se
75 Brook Farm Road
West Roxbury, MA 02132

## VERIFICATION

I, Yuriy B. Mankovskiy, Pro se, am the Plaintiff in the above entitled matter and have personal knowledge to testify to the matters stated therein. I have read the facts and allegations and declare under penalty of perjury in and for the State of Massachusetts that the above is true and correct to the best of my knowledge.

Yuriy B. Mankovskiy, Pro Se
75 Brook Farm Road
West Roxbury, MA 02132

On the 7th day of April, Yuriy B. Mankovskiy known to me appeared before me and executed the above document.

Suffolk.
NOTARY

My Commission expires: __



1

2                              **EXHIBITS**

3         ·              ·

4  Exhibit A:    Grant Deed

5  Exhibit B:    Deed of Trust / Mortgage

   Exhibit C:    OCC Asset Securitization Manual, Pg. 23

6  Exhibit D:    MERS Procedures Manual

7  Exhibit E:    MERS Patent

8  Exhibit F:    Pooling & Servicing Agreement (PSA) Special Purpose Vehicle Patent
                 http://www.freepatentsonline.com/y2003/0105713.html

9  Exhibit G: Certified Forensic Audit by Michael Carrigan

10 Exhibit H: Signed and Notarized Expert Witness Affidavit

11

12                        ʾ                                ·

13

14

15                                                  ·

16

17

18

19

20                                              ·

21

22

23

24

25

# Exhibit A

## Suffolk County - 20/20 Perfect Vision i2 Document Detail Report

**Current datetime: 10/25/2013 5:37:22 PM**

| Doc# | Document Type | Town | Book/Page | File Date | Consideration |
|------|---------------|------|-----------|-----------|---------------|
| 335 | DEED | | 27146/201 | 10/02/2001 | 374000.00 |

**Property-Street Address and/or Description**

BROOK FARM RD,   WELD ST,   WEST ROXBURY

**Grantors**

KOSMADAKIS ALEX P,   KOSMADAKIS KELLY M

**Grantees**

MANKOVSKIY YURIY B

**References-Book/Pg  Description  Recorded Year**

**Registered Land Certificate(s)-Cert#  Book/Pg**

27146 201

## QUITCLAIM DEED

335

We, ALEX P. KOSMADAKIS and KELLY M. KOSMADAKIS, now or formerly of 75 Brook Farm Road, West Roxbury, Suffolk County, Massachusetts

For consideration paid of Three Hundred and Seventy Four Thousand ($374,000.00) Dollars,

grant to YURIY B. MANKOVSKIY of 71 Fenwood Road, Suite #2, Boston, Massachusetts, with QUITCLAIM COVENANTS

The land situated in that part of Boston known as West Roxbury, Massachusetts, now being known as and numbered 75 Brook Farm Road, and being Lots #163 and #164, shown on a plan entitle "Plan of Sunnyside Park in West Roxbury, Mass., February 1902, owned by West Roxbury Land Company, White & Wetherbee, C. E., and recorded with Suffolk Deeds at end of Book 2817. Said Land is bounded and described:

SOUTHEASTERLY:  by Weld Street, eighty (80) feet;

SOUTHWESTERLY:  by Lot 165 on said plan, seventy nine (79) feet;

WESTERLY:  AND NORTHWESTERLY by Lots 167 and 168 on said plan by two certain lines measuring one hundred two and 2/10 (102.2) feet; and

NORTHEASTERLY:  by Lot 162 on said plan, one hundred twenty five and 9/10 (125.9) feet; or however otherwise said Lots 163 and 164 may be bounded and described, and said measurement more or less.

Said Lots containing according to said plan 7,100 square feet.

Excepting therefrom a parcel of land entitled Lot 163B on plan of land recorded with Suffolk County Registry of Deeds Book 20846, Page 194, by deed at Book 20846, Page 193. Premises are subject to easements and restrictions insofar as the same are now in force and applicable.

For title reference, see deed dated May 13, 1998, from Walter R. Wiederman and Laila S. Wiedman recorded at the Suffolk County Registry of Deeds in Book 22454, Page 003.

Witness my hand and seal this ___27___ day of ___September___, 2001.

_Alex Kosm_
Alex P. Kosmadakis

Witness my hand and seal this ___27___ day of ___September___, 2001.

_Kelly M. Kosmad_
Kelly M. Kosmadakis

FuchS
6 Beacon St.
Boston MA
02108

27146 202

COMMONWEALTH OF MASSACHUSETTS

Middlesex , ss.                                    Sept 27, 2001

Then personally appeared the above named Alex P. Kosmadakis and acknowledged the
foregoing instrument to be his free act and deed, before me,

Lisa M. Petersen  Lisa M. Petersen

Notary public:
My commission expires  8/29/08

THE COMMONWEALTH OF MASSACHUSETTS

Middlesex , ss.                                    Sept 27, 2001

Then personally appeared the above named Kelly M. Kosmadakis and acknowledged the
foregoing instrument to be her free act and deed, before me,

Lisa M. Petersen  Lisa M. Petersen

Notary Public:
My commission expires  8/29/08

# Exhibit B

## Suffolk County - 20/20 Perfect Vision i2 Document Detail Report

Current datetime: 10/25/2013 5:13:33 PM

| Doc# | Document Type | Town | Book/Page | File Date | Consideration |
|------|---------------|------|-----------|-----------|---------------|
| 134 | MORTGAGE | | 33995/123 | 03/12/2004 | 327500.00 |

**Property-Street Address and/or Description**

75 BROOK FARM RD,   WEST ROXBURY

Grantors

MANKOVSKIY YURIY B

Grantees

WORLD SAVINGS BANK FSB

References-Book/Pg  Description  Recorded Year

Registered Land Certificate(s)-Cert#  Book/Pg

RECORDING REQUESTED BY:
WORLD SAVINGS BANK

WHEN RECORDED MAIL TO:
WORLD SAVINGS
FINAL DOCUMENTATION
CLOSING DEPARTMENT
P.O. BOX 659548
SAN ANTONIO, TX 78265-9548

LOAN NUMBER:  0023597610

NOTE AMOUNT: $262,000.00

SUFFOLK REGISTRY
REC'D/ENT'D & EXAM ATT'ED.            134

2004 MAR 12  AM 9: 05

Francis M. Rowihi
REGISTER OF DEEDS

03/12/2004 Doc: 0134

FOR RECORDER'S USE ONLY

## MORTGAGE

THIS IS A FIRST MORTGAGE WHICH SECURES A NOTE WHICH CONTAINS
PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND
AMOUNT OF PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE
ADVANCES AND DEFERRED INTEREST). AT LENDER'S OPTION THE SECURED NOTE
MAY BE RENEWED OR RENEGOTIATED.

THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS MORTGAGE
IS $327,500.00 *  WHICH IS   125 % OF THE ORIGINAL PRINCIPAL NOTE
AMOUNT.

I.     DEFINITIONS OF WORDS USED IN THIS MORTGAGE
       (A)   Security Instrument. This Mortgage, which is dated MARCH 08, 2004,  " "
" " " will be called the "Security Instrument."

       (B)   Borrower,   YURIY MANKOVSKIY, AN UNMARRIED MAN

sometimes will be called "Borrower" and sometimes simply "I" or "me."

       (C) Lender.   WORLD SAVINGS BANK, FSB, " " " " " " " " " " " " " "
" " " " " " " " " " " " " " " " " " " " " " " " ITS SUCCESSOR AND/OR
ASSIGNEES, will be called "Lender." Lender is A FEDERAL SAVINGS BANK " " " " " "
" " " " " " which is organized and exists under the laws of the United States. Lender's
address is 1901 HARRISON STREET, OAKLAND, CALIFORNIA  94612.

       (D)   Note. The note signed by Borrower and having the same date as this Security
Instrument, including all extensions, renewals, substitutions and modifications thereof, will be
called the "Note." The Note shows that I owe Lender the original principal amount of U.S.
$262,000.00 " "     ("Note Amount"), plus accrued and deferred interest and such other
amounts as stated in the Note. I have promised to pay this debt in biweekly payments and to
pay the debt in full by MARCH 29, 2034.

       (E)   Property. The property that is described below in Section III entitled "Description
of the Property" will be called the "Property."
       (F)   Sums Secured. The amounts described below in Section II entitled "Borrower's
Transfer of Rights in the Property" sometimes will be called the "Sums Secured."
       (G)   Person. Any person, organization, governmental authority or other party will be
called "Person."

II.    BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY
       I mortgage, irrevocably grant and convey the Property with Mortgage Covenants (as
defined by Section 19 of the Massachusetts General Law, Chapter 183) to Lender subject to
the terms of this Security Instrument. This means that, by signing this Security Instrument, I am
giving Lender those rights that are stated in this Security Instrument
and also those rights that the law gives to lenders who hold
mortgages on real property. I am giving Lender these rights to
protect Lender from possible losses that might result if I fail to:

SD187A1 (01.07.99/1-99) J67A              Page 1                              MA
DEFERRED INTEREST               MORTGAGE-ADJ. BIWEEKLY
REV. (07.30.02/1-02)

* 0 0 3 *

LENDER'S USE ONLY

0023597610

(i)   pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender, and any changes to the Secured Notes made with the written consent of Lender;

(ii)   pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

(iii)   keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

## III.   DESCRIPTION OF THE PROPERTY
I give Lender rights in the Property described below:

(i)   The property which is located at 75 BROOK FARM ROAD, WEST ROXBURY, MA 02132. * * * * * * * * * * * * * * *   The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

(ii)   All buildings and other improvements that are located on the Described Property;

(iii)   All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)   All rents or royalties and other income from the Described Property;

(v)   All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)   All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)   All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)   All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future;

(ix)   All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)   All of the amounts that I pay to Lender under Paragraph 2 below.

## IV.   BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY
I promise that (i) I lawfully own the Property; (ii) I have the right to mortgage, grant and convey the Property to Lender; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## COVENANTS

I promise and I agree with Lender as follows:

## 1.   BORROWER'S PROMISE TO PAY
I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

0023597610

## 2.    PAYMENTS FOR TAXES AND INSURANCE

### (A)    Borrower's Obligations
I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

### (B)    Escrow Accounts

Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under paragraph 28, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

0023597610

**3.   APPLICATION OF BORROWER'S PAYMENTS**

Unless the law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes:

First, to pay prepayment charges due under the Secured Notes;
Second, to pay any advances due to Lender under this Security Instrument;
Third, to pay the amounts due to Lender under Paragraph 2 above;
Fourth, to pay interest due under the Secured Notes;
Fifth, to pay deferred interest due under the Secured Notes;
Sixth, to pay principal due under the Secured Notes;
Last, to pay late charges due under the Secured Notes.

**4.   BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**

I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a lien. I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5.   BORROWER'S OBLIGATION TO MAINTAIN INSURANCE**

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a Standard Mortgagee Clause to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

0023597610

If any Proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my biweekly payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 27 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

### 6.  BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS

I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

### 7.  LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY

If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may, without limitation, include appearing in court, paying reasonable attorneys' fees, purchasing insurance as required under Paragraph 5 above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes which have not been paid. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

### 8.  LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

### 9.  AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY

I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other government taking of the property. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

0023597610

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my biweekly payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

**10.   CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS**
**(A)   Borrower's Obligations**

Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the biweekly payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

**(B)   Lender's Rights**

Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 27 below to demand that I make immediate payment in full of the amounts that I owe to Lender under the Secured Notes and under this Security Instrument.

**11.   OBLIGATIONS OF BORROWER, CO-SIGNORS AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS**

Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent.

Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

**12.   MAXIMUM LOAN CHARGES**

If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.

**13.   LEGISLATION AFFECTING LENDER'S RIGHTS**

If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

0023597610

14. NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT

Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at 75 BROOK FARM ROAD, WEST ROXBURY, MA 02132. * * * * * * * * * * * * * * * * * * * * * * * * * * * *
A notice will be given to me at an alternative address if I give Lender notice of my alternative address. I may give notice to Lender of my alternative address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes. Except as permitted above for changes of address, any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I.(C) above entitled, "Definitions of Words Used in this Mortgage," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

15. GOVERNING LAW; SEVERABILITY

This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

16. BORROWER'S COPY

I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

17. LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY

If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B), enter upon and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 27, I understand and agree that (A) my right to occupy the Property ceases at the time the Property is sold; (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

18. INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS

An assignment is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include an action for breach of contract, fraud, concealment of a material fact or for intentional or negligent acts. I assign these rights, and any proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to any amount that I may owe to Lender under the Note and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment.

0023597610

**19.   CLERICAL ERRORS**

In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.   LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**21.   WAIVER OF STATUTE OF LIMITATIONS**

I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

**22.   CAPTIONS**

The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.   MODIFICATION**

This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

Lender may modify the Security Instrument and the Secured Notes at Lender's sole discretion in the event that I have failed to make my biweekly payments in the manner set forth in the Secured Notes. In the event of a modification to monthly payments, Lender will substitute the term "monthly payment" at each point that the term "biweekly payment" appears in this Security Instrument.

**24.   CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**

If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

(A)   If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

(B)   The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

(C)   If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a master or blanket policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such master or blanket policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such master or blanket policy to Lender annually.

33555
0023597610

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me.

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

(b)   I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the master or blanket hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

## 25.   FUTURE ADVANCES

At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower. Such future advances, with interest, will then be additional Sums Secured under this Security Instrument.

## 26.   AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

**Acceleration of Payment of Sums Secured.** Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)   Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)   Lender approves the creditworthiness of the transferee in writing;

(iii)   transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)   an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)   the transferee executes an assumption agreement which is satisfactory to Lender, such assumption agreement providing for transferee opening a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, for direct payment as provided in the secured notes.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

0023597610

27.   **RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY**
It will be called a "Breach of Duty" if (i) I do not pay the full amount of each biweekly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading; or (v) there occurs any breach of the Statutory Condition (as defined by Section 20 of the Massachusetts General Law, Chapter 183). If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

If there is a Breach of Duty by me, the Lender may take action to have the Property sold under any applicable Federal Law, rule or regulation and, where Federal Law is not applicable, under the law of the state where the Property is located, which will be called the "Applicable Law."

Lender does not have to give me notice of a Breach of Duty unless notice is required by Applicable Law. If Lender does not make a demand for full payment upon a Breach of Duty, Lender may make a demand for full payment upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed under the Applicable Law to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property. In addition to any other right or remedy available to Lender, if there is any Breach of Duty, including, without limitation, a breach of the Statutory Condition, Lender shall have and may exercise the Statutory Power of Sale (as defined by Section 21 of the Massachusetts General Law, Chapter 183).

The sale of the Property may be postponed by or at the direction of Lender except as limited or prohibited by the Applicable Law. If the Property is sold under the Applicable Law, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property, except to the extent that the Applicable Law limits or prohibits any such charges.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including trustees' and attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

28.   **LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT**
When Lender has been paid all of the amounts secured by this Security Instrument, Lender shall release or cancel this Security Instrument.

29.   **STATEMENT OF OBLIGATION**
To the extent allowed by law, I will give Lender a fee for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

30.   **WAIVER OF REDEMPTION**
My right of redemption is waived to the extent allowed by applicable law.

**THIS SPACE INTENTIONALLY LEFT BLANK.**

**31.    QUICK QUALIFYING LOAN PROGRAM**
I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that: (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

**32.    OWNER OCCUPANCY**
Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that: (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.

0023597610

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

EXECUTED AS AN INSTRUMENT UNDER SEAL.

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

WITNESS(ES):

BORROWER(S):

_____  (Seal)
YURIY MANKOVSKIY
B.

_____  (Seal)

_____  (Seal)

_____  (Seal)

COMMONWEALTH OF MASSACHUSETTS
ESSEX, ss.

On this  8 th  day of March 2004, before me, the undersigned notary public, personally appeared Yuriy B. Mankovskiy proved to me through satisfactory evidence of identification, a driver's license, to be the person whose name is signed on the foregoing instrument, and acknowledged to me that she signed it voluntarily for its stated purpose.

Kurt P. Mann, Notary Public
My commission expires: July 23, 2010

KURT P. MANN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 23, 2010

33995

# WORLD SAVINGS

## E X H I B I T  "A"
## LEGAL DESCRIPTION

LOAN NO. _____0023597610_____

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE COUNTY OF SUFFOLK
STATE OF MASSACHUSETTS * * * * , DESCRIBED AS FOLLOWS:

The land situated in that part of Boston known as West Roxbury, Massachusetts, now
being known as and numbered 75 Brook Farm Road, and being Lots #163 and #164,
shown on a plan entitled "Plan of Sunnyside Park in West Roxbury, Mass., February
1902, owned by West Roxbury Land Company, White & Wetherbee, C.E., and recorded
with Suffolk Deeds at end of Book 2817. Said land is bounded and described.

| | |
|---|---|
| SOUTHEASTERLY: | by Weld Street, eighty (80) feet; |
| SOUTHWESTERLY: | by Lot 165 on said plan, seventy nine (79) feet; |
| WESTERLY AND | |
| NORTHWESTERLY: | by Lots 167 and 168 on said plan by two certain lines measuring one hundred two and 2/10 (102.2) feet; and |
| NORTHEASTERLY: | by Lot 162 on said plan, one hundred twenty five and 9/10 (125.9) feet or however otherwise said Lots 163 and 164 may be bounded and described, and said measurement more or less. |

Said Lots containing according to said plan 7,100 square feet.

Excepting therefrom a parcel of land entitled Lot 163B on plan of land recorded with
Suffolk County Registry of Deeds, Book 20846, Page 194, by deed at Book 20846, page
193. Premises are subject to easements and restrictions insofar as the same are now in
force and applicable.

For my title see deed dated September 27, 2001, recorded with said Deeds in Book
27146, Page 201.

## Suffolk County - 20/20 Perfect Vision i2 Document Detail Report

**Current datetime: 10/25/2013 6:06:33 PM**

| Doc# | Document Type | Town | Book/Page | File Date | Consideration |
|------|--------------|------|-----------|-----------|---------------|
| 195 | RELEASE | | 34804/149 | 06/17/2004 | 0.00 |

**Property-Street Address and/or Description**

**Grantors**

WASHINGTON MUTUAL BANK FA

**Grantees**

MANKOVSKIY YURIY B

**References-Book/Pg  Description  Recorded Year**

29210/169  MTG  2002

**Registered Land Certificate(s)-Cert#  Book/Pg**

06/17/2004 Doc: 0195

## DISCHARGE OF MORTGAGE

WASHINGTON MUTUAL - CLIENT 908 #:0616943296 "MANKOVSKIY" Lender
ID:A01/004/0616943296  Suffolk, Massachusetts
KNOW ALL MEN BY THESE PRESENTS that WASHINGTON MUTUAL BANK, FA whose address
is 9601 MCALLISTER FRWY, SAN ANTONIO, TX 78216 holder of a certain Mortgage, whose parties,
dates and recording information are below, does hereby acknowledge that it has received full payment and
satisfaction of the same, and in consideration thereof, does hereby cancel and discharge said Mortgage.

Original Mortgagor: YURIY B MANKOVSKIY
Original Mortgagee: WASHINGTON MUTUAL BANK, FA
Date Executed: 08/20/2002 Recorded: 08/27/2002 in Book/Reel/Liber: 29210 Page/Folio: 169 as
Instrument No.: 376
In the County of Suffolk, State of Massachusetts

Property Address: 75 BROOK FARM ROAD, WEST ROXBURY, MA 02132

IN WITNESSOF, the said WASHINGTON MUTUAL BANK, FA by its authorized officer, has hereunto
set its corporate seal.

WASHINGTON MUTUAL BANK, FA
On June 8th, 2004

By: _____
N STATON, Assistant Vice-President

STATE OF Texas
COUNTY OF Bexar

Before me, the undersigned, , a Notary Public, on this day personally appeared N STATON, Assistant
Vice-President, personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
Given under my hand and seal of office, this day June 8th, 2004.

WITNESS my hand and official seal,

_____

Notary Expires:   /   /

Y. DE LA GARZA
Notary Public, State of Texas
My Commission Expires
JUNE 10, 2008

(This area for notarial seal)

*MARGIN: Property Address: 75 BROOK FARM ROAD, WEST ROXBURY, 02132*

"M3G"M3GWAMT"06/08/2004 05:02:56 PM" WAMU05WAMU000000000000001382978" MASUFFO" 0616943296 MASTATE_MORT_REL "M3G"M3GWAMT"

Recording Requested By:
Washington Mutual Bank FA

When Recorded Return To:

Washington Mutual
P O BOX 47529
SAN ANTONIO, TX 78265-7529

# Exhibit C



**L-Sec**

Comptroller of the Currency
Administrator of National Banks

# Asset Securitization

## Comptroller's Handbook

### November 1997

L

Liquidity and Funds Management

## Asset Securitization

## Table of Contents

| | |
|---|---|
| **Introduction** | 1 |
| Background | 1 |
| D efinition | 2 |
| A Brief History | 2 |
| Market Evolution | 3 |
| Benefits of Securitization | 4 |
| **Securitization Process** | 6 |

Basic Structures of Asset-Backed Securities .......... 6
    Parties to the Transaction .......... 7
Structuring the Transaction .......... 12
    Segregating the Assets .......... 13
      Creating Securitization Vehicles .......... 15
      Providing Credit Enhancement .......... 19
      Issuing Interests in the Asset Pool .......... 23
The Mechanics of Cash Flow .......... 25
    Cash Flow Allocations .......... 25

**Risk Management** .......... 30

Impact of Securitization on Bank Issuers .......... 30
    Process Management .......... 30
Risks and Controls .......... 33
    Reputation Risk .......... 34
    Strategic Risk .......... 35
    Credit Risk .......... 37
    Transaction Risk .......... 43
    Liquidity Risk .......... 47
    Compliance Risk .......... 49
    O ther Issues    49 Risk-Based Capital    56

i

**Examination Objectives** .......... 61

**Examination Procedures** .......... 62

O verview .......... 62

    Management O versight .......... 64

    Risk Management .......... 68

    Management Information Systems .......... 71

    Accounting and Risk-Based Capital .......... 73

Functions .......... 77

O riginations                                          77

Servicing                                             80

O ther Roles                                          83

O verall Conclusions                                  86

References                                            89

ii

that are insulated from third-party risk and have higher rated subordinated classes because of the credit-wrap. The objective from an issuer's viewpoint is to find the most practical and cost-effective method of providing the credit protection necessary for the desired credit rating and pricing of the security.

Most securities also contain performance-related features designed to protect investors (and credit enhancers) against portfolio deterioration. These "performance triggers" are designed to increase the spread account available to absorb losses, to accelerate repayment of principal before pool performance would likely result in losses to investors, or both. The first (most sensitive) triggers typically capture excess spread within the trust (either additions to existing spread accounts or a separate reserve fund) to provide additional credit protection when a portfolio begins to show signs of deterioration. If delinquencies and loss levels continue to deteriorate, early amortization events may occur. Early amortization triggers are usually based on a three-month rolling average to ensure that amortization is accelerated only when performance is consistently weak.

The originator or pool sponsor will often negotiate with the rating agencies about the type and size of the internal and external credit enhancement. The size of the enhancement is dictated by the credit rating desired. For the highest triple-A rating, the rating agencies are likely to insist that the level of protection be sufficient to shield cash flows against circumstances as severe as those experienced during the Great D epression of the 1930s.

## Issuing Interests in the Asset Pool

O n the closing date of the transaction, the receivables are transferred, directly or indirectly, from the seller to the special-purpose vehicle (trust). The trust issues certificates representing beneficial interests in the trust, investor certificates, and, in the case of revolving asset structures, a transferor (seller) certificate.

### Investors' Certificate

The investor certificates are sold in either public offerings or private placements, and the proceeds, net of issuance expenses, are remitted to the seller. There are two main types of investor interests in securitized assets — a discrete interest in

# Exhibit D

**MERS** ®

---

# Procedures Manual

## Release 19.0 June 14, 2010

# Transfer of Beneficial Rights to Member Investors

### Overview

Although MERS tracks changes in ownership of the beneficial rights for loans registered on the MERS® System, MERS cannot transfer the beneficial rights to the debt. The debt can only be

transferred by properly endorsing the promissory note to the transferee. As a MERS Member you have two options for registering a transfer of beneficial rights to another Member: Option 1 and Option 2. The determination of whether Option 1 or Option 2 is used is based on the Membership Profile of the purchasing investor.

**Option 1**



An Option 1 transfer can be created in either flat file/EDI X12 mode or online.

In an Option 1 transfer, the Investor transfers beneficial rights on a system other than MERS (example: MORNET) and that system then initiates the MERS transaction.

Loans in an Option 1 batch that have not been registered are automatically reprocessed (—cycled!) until the loans have been registered, up to ten (10) calendar days from the Transfer Date. Option 1 investors receive notification when MIN cycling begins through the *Transfer of Beneficial Rights Reject Report.*

If you include MINs that are not registered in your agency transmission (e.g. MORNET), you will receive an abbreviated version of the *Transfer of Beneficial Rights Reject Report* listing these unregistered MINs. It is your responsibility to register these MINs immediately, entering your MERS Org ID in the Investor field. If you register them after the 10 day cycling process is over, you must name the Agency in the Investor field.

An Option 1 Transfer of Beneficial Rights will replace any Option 2 investor on the loan. The investor that was removed during the Option 1 process is notified of its removal by the *Investor Removed by Option 1 TOB report.* Additionally, Interim Funder and Warehouse Gestation Lender interests are released automatically in an Option 1 beneficial rights transfer. No confirmations are required for Option 1 transfers.

---

**MERS** ®

## TERMS AND CONDITIONS

1. MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request.    The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents.

2. The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or

mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law.

3.  MERS shall at all times comply with the instructions of the holder of mortgage loan promissory notes. In the absence of contrary instructions from the note holder, MERS shall comply with instructions from the Servicer shown on the MERS® System in accordance with the Rules and Procedures of MERS.

4.  No rights or obligations of the Member with respect to any data or information supplied to MERS by or on behalf of the Member shall be altered or affected in any manner by the provision of such data or information to MERS (except as otherwise specifically provided in these Terms and Conditions or the Rules of Membership).

5.  If the Member uses MERS as Original Mortgagee (MOM) on the security instrument, the loan must be registered on the MERS® System within 10 days of the Note Date.

6.  MERS and the Member agree that: (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans, (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System.

7.  If the Member has a third-party register loans (the "Registrar") on the MERS® System on behalf of the Member, the Registrar shall not be deemed an agent of MERS.  The Registrar shall be solely an agent for the Member, and MERS is only giving consent to the Member to use a Registrar to enter information on the MERS® System on behalf of the Member.  The Member  agrees that  MERS is not liable to the Member for any errors and omissions, negligence, breach of confidentiality, breach of the Rules and Procedures, or willful misconduct of the Registrar, or any employee, director, officer, agent or affiliate of the Registrar in performing its services to the Member.

8.  The Member shall promptly pay to MERS the compensation due it for transactions registered on the MERS® System and other services rendered to the Member based on the then current MERS fee schedules, which may change from time to time.  The Member shall promptly pay to MERS any interest and penalties on delinquent fee payments at the rate set by MERS from time to time.  MERS shall have the authority to impose reasonable penalties and fines on Members for breach of the Governing Documents, and the Member shall promptly pay such fines in accordance with the terms of their imposition.

9.  MERS shall indemnify and hold harmless the Member, and any employee, director, officer, agent or affiliate of the Member  ("Member Party"), from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses ("indemnified Payments") that the Member Party may sustain directly from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, breach of the Rules and Procedures, or willful misconduct of MERS, or any employee, director, officer, agent or affiliate of MERS ("MERS Indemnified Claim").  Notwithstanding the foregoing, MERS shall not be liable or responsible under the terms of this Paragraph for any losses or claims

VC10052000VA

resulting from the actions or omissions of any person other than an employee, director, officer (who is also an employee of MERS), agent or affiliate of MERS.

The Member shall indemnify and hold harmless MERS, and any employee, director, officer, agent or affiliate of MERS ("MERS Party"), for any Indemnified Payments which do not result from a MERS Indemnified Claim and which such MERS Party incurs (i) from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, Rules and Procedures, or willful misconduct of a Member Party, (ii) with respect to a transaction on the MERS® System initiated by such Member, or (iii) as a result of compliance by MERS with instructions given by the Member, or its designee, as beneficial owner, servicer or secured party shown on the MERS® System ("Member Indemnified Claim").

MERS shall promptly notify the Member if a claim is made by a third party against either MERS or the Member with respect to any mortgage loan registered on the MERS® System in which the Member is shown on the MERS® System as beneficial owner, servicer or secured party in accordance with the Rules and Procedures.  The Member shall promptly notify MERS if a claim is made against the Member that may be subject to the indemnification provisions of this Paragraph.

The obligations of MERS and the Member under this Paragraph shall survive the termination of the Member's use of the MERS® System.

10. MERS and the Member shall maintain appropriate insurance coverage that shall include an errors and omissions insurance policy and a fidelity bond.   MERS shall not be required to maintain coverage for persons who may be appointed at the request of the Member as certifying officers of MERS.  The Member's policies shall protect and insure MERS against losses in connection with the release or satisfaction of a mortgage loan without having obtained payment in full of the indebtedness secured thereby.  Upon request, MERS or the Member shall cause to be delivered to the other a certified true copy of such errors and omissions insurance policy and fidelity bond.

   In the event  of any loss of  principal or  interest on  a mortgage loan or any Indemnified Payments for which reimbursement is received from a fidelity bond or any errors and omissions insurance policy or other insurance policy, the proceeds from any such bond or insurance shall be held in trust for and be promptly paid to the Member who is shown as the servicer on the MERS® System on behalf of the beneficial owner unless otherwise requested by the beneficial owner.

11. Any notice or other communication which is required or permitted to be given or made to MERS pursuant to any provision of the Governing Documents shall be given or made in writing and shall be sent by nationally recognized overnight courier, or facsimile followed by delivery of the original via first class mail, addressed as follows: MERS, Corporate Secretary, 1818 Library Street, Suite 300, Reston, Virginia, 20190.

12. These Terms and Conditions and all transactions effected by the Member with MERS shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

13. Neither the Member nor MERS shall institute a proceeding before any tribunal to resolve any controversy or claim arising out of or relating to these Terms and Conditions, Rules and Procedures, or the breach, termination or invalidity thereof (a "Dispute"), before such party has sought to resolve the Dispute through direct negotiation with the other party. If the Dispute is not resolved within thirty (30) days after a written demand for direct negotiation, the parties shall attempt to resolve the Dispute through mediation.  If the parties do not promptly agree on a mediator, either party may request the then chief judge of the Circuit Court of Fairfax County, Virginia to appoint a mediator. All mediation proceedings hereunder shall be held in Washington, D.C.   If the mediator is unable to facilitate a settlement of the Dispute within a reasonable period of time, as determined by the mediator, the mediator shall issue a written statement to the parties to that effect and the aggrieved party may then seek relief in accordance with the arbitration provisions of this Paragraph. The fees and expenses of the mediator shall be paid by the party initiating the Dispute.

   In the event that the Member and MERS are not able to resolve a Dispute in accordance with the mediation provisions of this Paragraph, such Dispute shall be settled by binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof; provided, however, that the place of arbitration shall be Washington, DC, and fees and expenses for the arbitration proceedings shall be paid by the party initiating arbitration.

# Exhibit E

<small>(19)</small> **United States**

<small>(12)</small> **Patent Application Publication** <small>(10)</small> **Pub. No.: US 2003/0105713 A1**
Greenwald et al. <small>(43)</small> **Pub. Date:      Jun. 5, 2003**

---

<small>(54)</small> **SPECIAL PURPOSE ENTITY FOR HOLDERS OF FINANCIAL INSTRUMENTS**

<small>(76)</small> Inventors: **Joshua D. Greenwald**, St. Louis Park, MN (US); **William J. Putney**, Minneapolis, MN (US)

<small>Correspondence Address:</small>
**Damon L. Boyd**
**Snell & Wilmer L.L.P.**
**One Arizona Center**
**400 East Van Buren**
**Phoenix, AZ 85004-2202 (US)**

<small>(21)</small> Appl. No.:      **10/308,692**

<small>(22)</small> Filed:      **Dec. 3, 2002**

**Related U.S. Application Data**

<small>(60)</small> Provisional application No. 60/338,495, filed on Dec. 3, 2001.

**Publication Classification**

<small>(51)</small> Int. Cl.<sup>7</sup> ......................................................... G06F 17/60
<small>(52)</small> U.S. Cl. ................................................................. 705/40

<small>(57)</small>      **ABSTRACT**

The present invention provides systems and methods for carrying out financial transactions which protect assets and provide various other advantages comprising a financial institution which issues a payment obligation, a special purpose entity, which acquires a residual obligation to honor the payment obligation as well as funds from the financial institution to honor the obligation. In accordance with various aspects of the present invention, the special purpose entity invests the acquired funds prior to honoring the payment obligation.





Figure 1



Figure 2



Figure     3



Figure    4

US 2003/0105713 A1

Jun. 5, 2003

1

## SPECIAL PURPOSE ENTITY FOR HOLDERS OF FINANCIAL INSTRUMENTS

### CROSS REFERENCES TO RELATED APPLICATIONS

[0001]  This application claims the benefit of the filing date of U.S. Provisional Patent Application Serial No. 60/338, 495, filed Dec. 3, 2001.

### FIELD OF INVENTION

[0002]  The present invention relates generally to methods and systems for performing financial services, and, more particularly, to methods and systems for performing financial transactions relating to presenting and paying a financial instrument using an entity separate from the entity issuing the financial instrument.

### BACKGROUND OF THE INVENTION

[0003]  Many financial instruments issued by a bank or other financial institution are regulated and/or licensed by various laws. For example, cashier or teller checks are typically regulated under the banking laws of the various states. Such "regulated payment obligations" are often sold (along with the funds specified in the instrument) to entities who process payment of the instrument when it is eventually presented for payment. Because such instruments are backed by the assets and/or creditworthiness of the financial institution which issued the instrument, the purchasing entity must also back the instrument with its own financial standing.

[0004]  In this regard, various financial institutions, such as banks, often have concerns as to the stability of the entity honoring the check. For example, it is desirable for the entity to be protected from bankruptcy. Likewise, in fact, some states require the entity backing the security to maintain a minimum of a 100% reserve in assets of the total value of the checks held and as such, with some exceptions, must have both legal and equitable title to the assets backing the checks.

[0005]  Accordingly, novel business entities, systems, methods and relationships between those entities are desirable to protect various assets and provide other advantages over the prior art.

### SUMMARY OF THE INVENTION

[0006]  The present invention provides systems and methods for carrying out financial transactions which secure assets and ensure checks and other financial obligations are honored, as well as provide various other advantages. For example, in an exemplary embodiment of the present invention, a system for carrying out a financial transaction comprises a financial institution which issues a payment obligation and a special purpose entity which acquires: (i) a residual obligation to honor the payment obligation and (ii) funds from the financial institution to honor the obligation. In accordance with various aspects of the present invention, the special purpose entity is provided with the ability to invest the acquired funds prior to honoring the payment obligation.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0007]  Additional aspects of the present invention will become evident upon reviewing the non limiting embodi-

ments described in the following specification and claims taken in conjunction with the accompanying drawing figure, wherein like numerals designate like elements, and:

[0008]  FIG. 1 is a block diagram of an exemplary embodiment of a special purpose entity configuration in accordance with the present invention;

[0009]  FIG. 2 is a block diagram of another exemplary embodiment of a special purpose entity configuration in accordance with the present invention;

[0010]  FIG. 3 is a block diagram of another exemplary embodiment of a special purpose entity configuration in accordance with the present invention; and

[0011]  FIG. 4 is a block diagram of still another exemplary embodiment of a special purpose entity configuration in accordance with the present invention.

### DETAILED DESCRIPTION

[0012]  The following descriptions are exemplary embodiments only, and are not intended to limit the scope, applicability, or configuration of the invention in any way. Rather, the following description provides a convenient illustration for implementing various embodiments of the invention. Various changes may be made in the function and arrangement of elements described in the preferred embodiments without departing from the spirit and scope of the invention as set forth in the appended claims. That is, in this regard, the present invention may be described herein in terms of functional block components and various processing steps. It should be appreciated that such functional blocks may be realized by any number of hardware, firmware, and/or software components configured to perform the specified functions. For example, the present invention may employ various integrated circuit components, e.g., memory elements, digital and/or analog signal processing elements, look-up tables, and the like, which may carry out a variety of functions under the control of one or more microprocessors or other control devices. Such general techniques and components that are known to those skilled in the art are not described in detail herein.

[0013]  That being said, the present invention provides systems and methods for performing various financial transactions in a manner which gives the organizations involved in the transaction increased security. For example, in accordance with an exemplary embodiment of the present invention, a financial institution such as a bank 100 issues a regulated payment obligation 102, such as a check 102 backed by that financial institution 100. A payment processor 104 and a legally separate entity 106 from the payment processor 104 are provided. In accordance with various aspects of the present invention, separate entity 106 is a trust. For purposes herein, separate entity 106 is referred to as a "special purpose entity" or "SPE". However, in accordance with various alternative embodiments, SPE 106 may comprise various other legal entities which are suitably capable of performing various functions described herein.

[0014]  SPE 106 acquires from 100 financial institution funds sufficient to honor regulated payment obligation 102 and a contractual obligation to honor regulated payment obligation 102. Payment processor 104 acquires from financial institution 100 a residual obligation to honor regulated payment obligation 102 if entity 106 does not or cannot pay the obligation.

[0015]   As mentioned above, and with reference to FIG. 1, in the presently described embodiment and in accordance with various aspects of the present invention, financial institution 100 may be a bank, regulated payment obligation 102 is a check and SPE 106, which honors check 102, is a special purpose entity trust. In accordance with various additional aspects of the present invention, the funds sufficient to honor check 102 and various other any transaction costs created by payment processor 104 acquiring funds as well as the legally obligated amount of check 102.

[0016]   Thus, special purpose entity 106 receives funds directly from bank 100 as a payment of receivables representing the legal obligation to honor the presented check 102. Additionally, as will be described further herein, special purpose entity 106 is able to invest the funds pending payment of check 102.

[0017]   That being said, with continuing reference to FIG. 1, an exemplary embodiment of systems in accordance with the present invention as illustrated. FIG. 1 illustrates the interaction of bank 100, payment processor 104, SPE 106 and a check holder 108 through various computer networks and software operations. Though not described in detail herein, it should be appreciated that any number and type of network, cabling, telephone lines and computers, and various banking technology, now known or as yet unknown, may be used in accordance with the present invention.

[0018]   Typically, payment processor 104 provides check services to bank 100, bank 100 issues checks 102 and remits the amounts of checks 102 to payment processor 104 on the business day following issuance of check 102. Payment processor 104 pays check 102 when it is presented through a clearing bank. In the interim, between issuance of check 102 and payments on check 102, payment processor 104 is permitted to invest the funds transferred from bank 100 to payment processor 104 in certain permissible investments. This amount or "float" can then accrue interest. Similarly, in accordance with various aspects of the present invention, in lieu of bank 100 transferring remittances to payment processor 104, bank 100 may present remittances to SPE 106 for presentation.

[0019]   Preferably, in accordance with various embodiments of the present invention, SPE 106 is suitably contractually prohibited from making a voluntary bankruptcy filing without bank's 100 consent, while being permitted to invest the remittances it receives from bank 100. Additionally, optionally, SPE 106 can be set up in such a way that it is a distinct entity from any other legal entities making SPE 106 a legally separate, bankruptcy remote entity.

[0020]   In accordance with another aspect of the present invention, to comply with various regulatory authorities, an additional entity may be formed which enters into various relationships with SPE 106. For example, with reference now to FIG. 2, a similar system to that shown in FIG. 1 comprising bank 100, payment processor 104, SPE 106 and a check holder 108 are again provided. Again, payment processor/SPE 104, 106 provides check services to bank 100, bank 100 issues checks 102 and remits the amounts of checks 102 to payment processor/SPE 104, 106 on the business day following issuance of check 102. Payment processor/SPE 104, 106 pays check 102 when it is presented through a clearing bank. In the interim, between issuance of check 102 and payments on check 102, payment processor/

SPE 104, 106 is permitted to invest the funds transferred from bank 100 to payment processor/SPE 104, 106 in certain permissible investments.

[0021]   Additionally, in accordance with this embodiment of the present invention, a legal title entity 107 is provided. Legal title entity 107 suitably comprises an entity in accordance with the present invention with the ability to perform various actions and have certain ownership rights with respect to checks 102 and the assets backing those checks 102. For example, legal title entity 107 suitably has the ability to hold legal title to assets backing checks 102, without likewise having equitable ownership of the same. In such instances, various advantages of legal entity 107 may be realized.

[0022]   For example, as mentioned above, while some states require SPE 106 to secure 100% of the value of checks 102 with various assets, including legal and equitable ownership of those assets, there are potential exceptions to the various state regulations which would require the same. Such exceptions include states which allow legal title entity 107 to act as a "designated nominee" for holding title to the relevant securities, while SPE 106 maintains all other ownership rights, including the right to invest funds relating to those assets. For example, in one non-limiting embodiment of the present invention, legal title entity 107 is in the form of a partnership (or other legal entity) which enters into a legal agreement with SPE 106 to act as the designated nominee of SPE 106. In such forms, the various regulatory authorities deem the financial institutions in compliance with the applicable regulations, while allowing SPE 106 to function as described above (e.g., investing funds) which otherwise would not be permitted, thus providing distinct advantages over the prior art.

[0023]   That said, it should be appreciated that the term "designated nominee" is used for exemplary and illustrative purposes, but should not be construed as so limited. For example, many other designations which have a similar effect, i.e., provide legal title entity 107 with various rights on behalf of SPE 106, should likewise be construed as falling within the scope of the present invention.

[0024]   In accordance now with various additional aspects of the present invention, SPE 106 may be provided with excess cash such as, for example, undistributed dividends. SPE 106 may also have a revolving credit loan program with a CAG. SPE 106 may hold liquid investments that may be sold. SPE 106 also may have the benefit of a letter of credit from another bank 112. Thus, the foregoing capabilities allow SPE 106 to be able to pay a greater amount of checks presented on a given day even when the remittances received that day are less than those checks presented.

[0025]   With reference now to FIG. 3, an alternative embodiment of the present invention is illustrated. As shown, payment processor 104 creates SPE 106 which is 100% owned by a CAG 110, preferably a wholly owned subsidiary of payment processor 104. CAG 104 preferably makes an initial capital contribution to SPE 106. SPE 106 then invests the total amount of cash provided to it in permissible investments held for the benefit of check holders 108. In accordance with the present invention, SPE 106 suitably assumes contractual liability for payments on checks 102. However, in accordance with various aspects of the present invention, if SPE 106 cannot or will not pay

checks 102, payment processor 104 remains liable for such payment. Thus, SPE 106 formalizes statutory requirements that permissible investments are held in trust for check holders 108.

[0026]   With reference now to FIG. 4, an alternative embodiment of the present invention is illustrated. In accordance with this embodiment, remittances due from bank 100 with respect checks 102 are suitably sold or contributed as capital to SPE 106 in return for assumption of liability to check holders 108. These remittances are suitably a net of amounts due from payment processor 104 to bank 100. Payments on the remittances are suitably made to SPE 106. CAG 110 lends money to SPE 106 under a revolving credit note. To the extent the amount of cash remittances obtained by SPE 106 daily is greater than amounts paid on checks 102, the note are paid down into the extent the amount of cash is less, the note will be increased. In accordance with this exemplary embodiment, payment processor 104 acts as an administrator for the transactions. Collections and investments are made in accordance with payment processor's 104 usual procedures with the exception that the investments are identified as belonging to SPE 106. Thus, SPE 106 tracks in substantially the same manner investments made by payment processor 104 with respect to different remittances. As described above, in the event SPE 106 has insufficient money to pay check holders 108, a draw may be made on items such as letters of credit provided by other banks or through payment processor 104 itself.

[0027]   Last, while the principles of the invention have been made clear by the non-limiting, illustrative embodiments described above, there will be immediately obvious to those skilled in the art many modifications of structure, arrangements, proportions, the elements, materials and components, used in the practice of the invention which are particularly adapted for a specific environment and operating requirements without departing from those principles and/or the cope of the invention as set forth in the appended claims.

We claim:

1. A network of legal entities for carrying out financial transactions, comprising:

a financial institution which issues a payment obligation;

a special purpose entity, wherein said special purpose entity acquires (a) a residual obligation to honor said

payment obligation, and (b) funds from said financial institution to honor said payment obligation;

a payment processor, wherein said payment processor acquires a residual obligation to honor said payment obligation if said special purpose entity does not honor said payment obligation; and

assets which secure said payment obligation.

2. The system of claim 1, wherein said special purpose entity invests said funds acquired from said financial institution prior to honoring said payment obligation.

3. The system of claim 1, wherein said financial institution comprises a bank.

4. The system of claim 1, wherein said special purpose entity comprises a trust.

5. The system of claim 1, wherein said special purpose entity is a bankruptcy remote entity.

6. The system of claim 1, wherein legal title to said assets is held by said special purpose entity.

7. The system of claim 1, further comprising a legal title entity acting as a designated nominee of said special purpose entity, and legal title to said assets is held by said legal title entity.

8. The system of claim 6, wherein said legal title entity is a partnership.

9. An improved system for carrying out financial transactions, comprising:

a bank which issues a payment obligation;

a special purpose entity, wherein said special purpose entity acquires (a) a residual obligation to honor said payment obligation, (b) acquires funds from said bank to honor said payment obligation, and (c) invests said funds prior to honoring said payment obligation;

a legal title entity acting as a designated nominee of said special purpose entity and holding legal title to assets which secure said payment obligation; and

a payment processor, wherein said payment processor acquires a residual obligation to honor said payment obligation if said special purpose entity does not honor said payment obligation.

10. The system of claim 9, wherein said special purpose entity comprises a trust.

11. The system of claim 9, wherein said legal title entity comprises a partnership.

*   *   *   *   *

# Exhibit F

# Exhibit G



# *PROPERTY SECURITIZATION ANALYSIS REPORT*[TM]

*Prepared for:*

*Yuriy B. Mankovskiy*

*For Property Address*

*75 Brook Farm Road*
*West Roxbury, MA 02132*

*Prepared on:*

*April 4, 2017*



# SECTION 1:   TRANSACTION DETAILS

## BORROWER & CO-BORROWER:

| BORROWER | CO-BORROWER |
|---|---|
| Yuriy B. Mankovskiy | None |
| **CURRENT ADDRESS** | **SUBJECT ADDRESS** |
| 75 Brook Farm Road, West Roxbury, MA 02132 | 75 Brook Farm Road, West Roxbury, MA 02132 |

## TRANSACTION PARTICIPANTS

| AMOUNT | MORTGAGE SERVICER | MORTGAGE NOMINEE/BENEFICIARY |
|---|---|---|
| $262,000.00 | Wells Fargo Bank, NA | World Savings Bank, FSB |

| ORIGINAL MORTGAGE LENDER | LOAN TYPE | TITLE COMPANY |
|---|---|---|
| World Savings Bank, FSB 1901 Harrison Street Oakland, CA 94612 | Conventional 30 Year Adjustable Rate Mortgage Loan with 125% Negative Amortization Cap | Not Stated<br><br>Documents returned to: World Savings Final Documentation Closing Dept. PO Box 659548 San Antonio, TX 78265 |



## SECTION 2: SECURITIZATION
## SECURITIZATION PARTICIPANTS:
## PRIVATE PLACEMENT

| ORIGINATOR/LENDER | SPONSOR/SELLER | DEPOSITOR |
|---|---|---|
| World Savings Bank, FSB | WORLD SAVINGS BANK, FSB | TBD |
| **ISSUING ENTITY** | **TRUSTEE** | **MASTER SERVICER/ SERVICER** |
| WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST | The Bank of New York | World Savings Bank, FSB |
| **CUSTODIAN** | **CUT – OFF DATE** | **CLOSING DATE** |
| The Bank of New York or appointee | TBD | On or about April 7, 2004 |

\* This is a private placement as defined in Rule 144a of the Securities Act of 1933. As such, a prospectus and other investor information are not publicly disclosed. This type of report may otherwise include extracts of the prospectus supplement (Form 424B5) indicating the securitization transaction parties; assignment and delivery of the mortgage loans; and extracts of the Pooling and Servicing Agreement, notably the conveyance of the loan verbiage generally placed into "Section 2.01" of such agreements.

This private placement is an indication that the note has been sold and securitized to third parties similar to publically reporting mortgage trusts.



# SECTION 3:   FORECLOSURE

**Recorded Events on the Loan Including Foreclosure Issues and Securitization**

| Recorded Chain of Mortgage Possession | | Chain of Note Possession | |
|---|---|---|---|
| Date | Original Mortgage | Date | Note Holder |
| March 12, 2004<br>Instrument #<br>33995-0134<br>Official Records,<br>Suffolk Registry<br>Massachusetts | Yuriy B. Mankovskiy<br>(Borrower)<br><br>World Savings Bank, FSB (Lender) | March 8, 2004 | World Savings Bank, FSB<br>( Lender)<br>Principal Amount:<br>$262,000.00<br><br>**LOAN # 0023597610** |
| | | April 7, 2004 | WORLD SAVINGS BANK<br>MORTGAGE PASS-THROUGH<br>CERTIFICATES REMIC 15<br>TRUST<br>Lender<br>Principal Amount:<br>$262,000.00 |
| | | MEMO:<br>May 7, 2006 | Acquisition of Golden West<br>Financial / World Savings<br>operations by Wachovia Bank,<br>NA |
| | | MEMO:<br>December 31, 2008 | Acquisition of Wachovia Bank<br>and Golden West Financial /<br>World Savings operations by<br>Wells Fargo Bank, NA |

*Note: The above analysis only covers bank actions related to primary active loan.*

*Examiner notes that no Assignment of Mortgage from World Saving Bank, FSB to
Wachovia Bank, NA or to Wells Fargo Bank, NA was recorded*



# REPORT SUMMARY

**Mortgage:**

- On March 8, 2004, Debtor Yuriy B. Mankovskiy executed a negotiable promissory note and a security interest in the form of a Mortgage in the amount of $ 262,000.00. This document was filed as document number 33995-0134 in the Official Records of Suffolk Registry. ***The original lender of the promissory note and mortgagee is World Savings Bank, FSB.***

**Securitization (The Note):**

- The NOTE may have been sold, transferred, assigned and securitized into the WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST with a Closing Date of April 7, 2004.

**Sample information regarding the acquisition of Golden West Financial (operator of World Savings) by Wachovia Bank 5/7/06; and 12/31/08 Wells Fargo acquisition of Wachovia can be found at:**

**https://www.wellsfargo.com/about/corporate/worldsavings**
**http://en.wikipedia.org/wiki/Wachovia**

**NO ASSIGNMENT OF MORTGAGE HAS BEEN MADE TO WACHOVIA BANK, WELLS FARGO BANK OR ANY OTHER PARTY AS REQUIRED TO PERFECT SECURITY INTEREST IN NOTE UPON SALE**



# BLOOMBERG SEARCH SECTION

On **April 3, 2017**, I researched the Bloomberg online Database at the request of **Certified Forensic Loan Auditors, LLC** on behalf of **Yuriy B. Mankovskiy** whose property address is noted herein above. The Loan Level Data search conducted using Bloomberg's terminal did not reveal matching characteristics based on the Loan Number: **0023597610**; Original Amount: **$262,000.00**; Origination Date: **March 8, 2004**; Location of Property: **MA**; Property Type: **Single Family Residence;** Occupancy: **Owner Occupied**; Zip Code **02132.** However, examiner did locate a prospective REMIC TRUST within the Securities Exchange Commission (SEC) website that matches the characteristics for the possibility of securitizing this loan. Bloomberg snapshots of that Trust are provided below. This trust is the **WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST.**

**Identification of exact World Savings trust or other portfolio may be obtained through a Qualified Written Request, a Request for Information under Regulations X or Z, voluntary lender disclosure, a Freedom of Information Act request as applicable, or discovery through litigation.**

Sample information regarding the Wachovia Bank acquisition of Golden West Financial Corporation ("Golden West"), which operated branches under the name World Savings Bank can at found at: http://en.wikipedia.org/wiki/Wachovia
The purchase was agreed to on May 7, 2006 approximately two years prior to the subject loan.

Information from Wells Fargo Bank regarding its purchase of Wachovia Corporation and the Worlds Savings acquisition is at: https://www.wellsfargo.com/about/corporate/worldsavings

Examiner notes that there are several possibilities for this loan:
1) The loan was placed into one of several Wachovia Bank or other publically reporting trusts, such as the one identified shortly following the execution of the loan.
2) The loan was placed into a private trust exempt from SEC reporting under rule 144a of the Securities Act of 1933 or otherwise not reported to the SEC or to Bloomberg LP.
3) Golden West held the loan in a non-MBS portfolio, which was followed by a purported acquisition of the loan by Wachovia Bank, followed by a purported acquisition of the loan by Wells Fargo Bank, N.A., which may or may not have been made in compliance with the applicable state Uniform Commercial Code.
4) Golden West held the loan in an MBS (mortgage-backed security) as stated in its SEC filings (e.g. 10-Q filing for quarter ended 6/30/2005 http://www.sec.gov/Archives/edgar/data/42293/000119312505160486/d10q.htm p. 21 in which it stated that it securitized loans it held as MBS so that it could, in effect, borrow more money.
   a. *"Securitization Activity*
      We often securitize our portfolio loans into mortgage-backed securities. We do this because MBS are a more valuable form of collateral for our borrowings than whole loans. Because we have retained all of the beneficial interests in these MBS securitizations to date, the accounting rules require that securitizations formed after March 31, 2001 be classified as securitized loans and included in our loans receivable. Securitization activity for the three and six months ended June 30, 2005 amounted to $7.0 billion and $8.1 billion, respectively, compared to $10.2 billion and $10.9 billion for the same periods in 2004. The volume of securitization activity fluctuates depending on the amount of collateral needed for borrowings and liquidity risk management." (EMPHASIS ADDED BY EXAMINER.)



Examiner notes that if such borrowings can be traced directly to such MBS portfolio loans that the economic effect is that of a sale.

   b.   The following is an extract from the 2005 annual report form 10-K covering the period in which the loan was originated http://www.sec.gov/Archives/edgar/data/42293/000119312506048352/d10k.htm

Securitized Loans

The Company securitizes certain loans from a held for investment loan portfolio into MBS which are available to be used as collateral for borrowings. In accordance with Statement of Financial Accounting Standards No. 140, "*Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*" (SFAS 140), loan securitizations are not recorded as sales because 100% of the beneficial ownership interests are retained by the Company, including both the primary and subordinate retained interests.

Loans securitized after March 31, 2001 are securities included in Loans Receivable. Securities resulting from loan securitizations formed prior to April 1, 2001 are included in MBS with recourse, recorded at cost, and are evaluated for impairment based upon the characteristics of the underlying loans.   (EMPHASIS ADDED BY EXAMINER).

This is an indication that such MBS portfolios kept on the Golden West balance sheet could have been directly identifiable to secured borrowings from 3rd party lenders.

   c.   The following is an extract from the 2005 annual report form 10-K covering the period in which the loan was originated http://www.sec.gov/Archives/edgar/data/42293/000119312506048352/d10k.htm

**Borrowings**. We also borrow money from a variety of sources to fund our loan origination activities. Borrowings include taking "advances" from the Federal Home Loan Bank (FHLB) system, entering into reverse repurchase agreements with selected dealers, and issuing unsecured debt securities. FHLB advances and reverse repurchase agreements require us to pledge collateral to the lenders, sometimes in the form of whole loans and sometimes in the form of securitized pools of loans. We regularly securitize loans from our portfolio into MBS and Real Estate Mortgage Investment Conduit securities (MBS-REMICs) to create collateral for our secured borrowings. *Additional information about our borrowings and securitization activity can be found in the MD&A under "The Loan Portfolio – Securitization Activity" and "Borrowings," and detailed borrowing Tables 16 and 17.* (EMPHASIS ADDED BY EXAMINER.)

This is an indication that portfolio loans were turned into MBS and MBS-REMICs to secure borrowings from the FHLB; from purchasers for repurchase agreements (with to be discovered parties through securities dealers – typically fixed income institutional investors, such as pension plans, corporations, hedge funds and the security dealers' own positions). The subject loan, could thus have in effect, been sold inasmuch as the Golden West position was partially or wholly offset by a; secured borrowing wherein the subject loan was used as collateral within an MBS pool.

The Oakland office of Deloitte and Touche LP (nka Deloitte LLP) gave a clean opinion on the above financial statements for the year ended December 31, 2005, the last year of Golden West as an independent company.



The following is an extract of the financial position of Golden West as of 12/31/05, the year that the loan was originated from the annual 10-K report http://www.sec.gov/Archives/edgar/data/42293/000119312506048352/d10k.htm p. 34.

At that particular point, $66.3 billion of portfolio loans were held in non-securitized corporate portfolios; $49.9 billion was held as securitized loans; "other" of $1.7 billion of work-in-process loans and allowances; $1.2 billion of MBS WITH RECOURSE; and $315 million of purchased MBS, for a total of $119.4 billion.

The $49.9 billion are not noted as securitized loans with recourse. This indicates that these loans are securitized loans <u>without recourse</u> as such SEC reports are prepared for the purpose of fair disclosure to investors. Thus, at this point approximately 42% of the loans on the Golden West balance sheet do not appear to have been effectively at risk to Golden West in case of default.



**THE ABOVE INDICATES THAT CERTAIN GOLDEN WEST PORTFOLIO LOANS WERE SECURITIZED AND SUCH SECURITIZATION TRUSTS WERE USED TO OFFSET THE RISKS AND BENEFITS OF OWNERSHIP AS A REAL PARTY IN INTEREST.**

SUBSEQUENT TO THE PURCHASE OF GOLDEN WEST FINANCIAL BY WACHOVIA BANK, NA, WACHOVIA BANK DISCLOSED THAT IT ALSO HELD UP TO 90% OF THE BENEFICIAL INTEREST IN CERTAIN SECURITIZATION TRUSTS. INSTEAD OF RETAINING THOSE TRUSTS AND DIRECT SECURED BORROWINGS IN ITS FINANCIAL STATEMENTS, IT CLASSIFIED SUCH FINANCIAL POSITIONS AS "QUALIFYING SPECIAL PURPOSE ENTITIES" AND REMOVED ASSETS SOLD TO SUCH ENTITIES FROM ITS BALANCE SHEET. FOR ANY SUCH TRUSTS WACHOVIA HELD MORE THAN 90% OF THE BENEFICIAL INTEREST, ACCOUNTING RULES REQUIRED THOSE ASSETS TO BE PLACED ON ITS BALANCE SHEET.



*SECURITIZATIONS AND BENEFICIAL INTERESTS*

In certain asset securitization transactions that meet the applicable criteria to be accounted for as a sale, assets are sold to an entity referred to as a "qualifying special purpose entity" ("QSPE"), which then issues beneficial interests in the form of senior and subordinated interests collateralized by the assets. In some cases, the Company may retain as much as 90 percent of the beneficial interests. Additionally, from time to time, the Company may also resecuritize certain assets in a new securitization transaction.

The assets and liabilities sold to a QSPE are excluded from the Company's consolidated balance sheet, subject to a quarterly evaluation to ensure the entity continues to meet the requirements to be a QSPE. If the Company's portion of the beneficial interests exceeds 90 percent, a QSPE would no longer qualify for off-balance sheet treatment and the Company may be required to consolidate the SPE, subject to determining whether the entity is a VIE and to determining who is the primary beneficiary. In these cases, any beneficial interests previously held by the Company are derecognized from the balance sheet and the underlying assets and liabilities of the SPE are recorded at fair value to the extent interests were previously held by outside parties.

The carrying amount of the assets transferred to a QSPE, excluding servicing rights, is allocated between the assets sold and the retained interests based on their relative fair values at the date of transfer. A gain or loss is recorded in other fee income for the difference between the carrying amount and the fair value of the assets sold. Fair values are based on quoted market prices, quoted market prices for similar assets, or if market prices are not available, then the fair value is estimated using discounted cash flow analyses with assumptions for credit losses, prepayments and discount rates that are corroborated by and independently verified against market observable data, where possible. Retained interests from securitizations with off-balance sheet entities, including QSPEs and VIEs where the Company is not the primary beneficiary, are classified as either available for sale securities, trading account assets or loans, and are accounted for as described herein.

## p. 76 of Wachovia Bank's Final Annual Report 12/31/07
### http://www.annualreports.com/HostedData/AnnualReports/PDFArchive/wb2007.pdf

## SUCH "QPSEs" CONCEALMENT ENTITIES WERE ALLOWED BY THE FINANCIAL ACCOUNTING STANDARDS BOARD BUT BANKS ARE REQUIRED TO SET ASIDE ADDITIONAL CAPITAL RESERVES AND REPORT LOSSES ON THEIR OWN BOOKS

### http://www.nysscpa.org/blog/2009/5/18/fasb-tightens-rules-qspes



About Us | Continuing Education | Future CPAs | Gov't Action Center | Members | Professional Resources | Society Pubs. | Tax

**Become A Society Leader... Submit Your Nomination Today.** NYSSCPA

Home ● Blog ● May, 2009 ● FASB

# CPA|BLOG®

## FASB Tightens Rules on QSPEs

Submitted by Cara Patterson on Mon, 05/18/2009 - 13:20  FASB   Financial Crisis   Regulatory Activities

An accounting rule often blamed for its role in the mortgage crisis is getting its comeuppance. FASB voted today to tighten rules on qualified special purpose entities.

The rules allowed companies to keep loans off their balance sheets, but the change will require companies to report loans contained in the QSPEs and to increase their capital reserves in proportion as a buffer against potential losses. Regulators say the move will increase transparency.

The recent regulatory stress tests uncovered that the new rule would likely require the 19 largest banks to acknowledge $900 billion in loans and other net assets, according to the Washington Post.

Comptroller of the Currency John C. Dugan has said that banks applied less rigorous underwriting standards on loans sold to investors compared with the loans retained by the banks, the Post reported, setting the stage for investor outrage when banks reported billions of dollars in losses on loans that had been concealed through QSPEs.

While FASB's decision last month regarding mark-to-market accounting was viewed as giving banks more latitude to boost balance sheets, the new rule moves in the opposite direction by requiring banks to disclose high-risk loans, the Associated Press reported.

RSS FEED

Help

**RECENT COMMENTS**
- Pingback
  SCOTUS to Hear
  Healthcare Case This
  Week | NYSSCPA.ORG
  03/26/2012 - 11:15
- Non-CPA Ownership
  Anonymous
  02/08/2012 - 14:48
- Corzine and Skiling
  Bill Tracy, CPA
  12/22/2011 - 13:44
- Pingback
  Media Expert Jim
  Cameron Responds |
  NYSSCPA.ORG
  12/02/2011 - 15:47
- Pingback



**THE BOTTOM LINE IS THAT GOLDEN WEST / WORLD SAVINGS ESTABLISHED SECURITIZED TRUSTS FOR THE PURPOSE OF BORROWING ADDITIONAL FUNDS. WACHOVIA USED AGGRESSIVE ACCOUNTING RULES TO REMOVE SUCH TRUSTS FROM ITS BALANCE SHEET ALONG WITH DIRECTLY IDENTIFIABLE BORROWINGS. WELLS FARGO BANK THEN ACQUIRED THE FAILED WACHOVIA BANK AND SUBSIDIARY GOLDEN WEST FINANCIAL / WORLD SAVINGS.**

**Whether Wells Fargo Bank, NA followed the Massachusetts Uniform Commercial Code in endorsing the subject promissory note and perfecting its security interest through a valid Assignment of Mortgage is a matter for discovery. There is no evidence of any such assignments in Suffolk Registry records.**

The December 20, 2010 $32 million settlement with then Attorney General Edmund G. Brown Jr. and Wells Fargo Bank regarding "pick-a-pay" loans of World Savings Bank and related information can be found on the California Attorney General web site at:
http://oag.ca.gov/news/press-releases/brown-reaches-settlement-wells-fargo-worth-more-2-billion-californians-risky

## DESCRIPTION OF SECURITY FROM BLOOMBERG

This is a private placement stated to be subject to rule 144(a) of the Securities Act of 1933, restricted to non-US investors, unless otherwise qualified.



## DEAL DESCRIPTION



Page

**Bloomberg**
CMO

**DEAL DESCRIPTION**          Page 2 of 3
WSR 15          Group-All Collat
Issuer: WORLD SAVINGS REMIC          ∞ PAID OFF ∞
Series 15          Aggregate: WHARM N

| DEAL - ASSUMED | | PSA-DEAL-CPR | | | | WHARM N |
|---|---|---|---|---|---|---|
| USD 7,826,715,875 | 1mo | = | = | = | = | |
| Net        % | 3mo | = | = | = | = | |
| WAC        % | 6mo | = | = | = | = | |
| WAM     n/a | 12mo | = | = | = | = | |
| AGE   0:0    0 mo | Life | = | = | = | = | |

ACTUAL

COLLATERAL

NOT

AVAILABLE

1st paymt  5/20/04
1st settle  4/ 7/04
px20.0 CPR  4/ 7/04
PAC  0%  SUP  0%
Dated

Monthly PAYMENT
pays 20th day
19 day delay          0 Lead Mgr: WSB
accrues 30/360          Trustee: BNY

COLLATERAL
Country  US

See Page 3 for Comments.

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900   Singapore 65 6212 1000   U.S. 1 212 318 2000   Copyright 2017 Bloomberg Finance L.P.
SN 263920 PDT GMT-7:00 H424-2255-0 03-APR-2017 19:20:43

---

## STRUCTURED FINANCE NOTES SCREEN
### Lists the primary parties to the securitization

| ‹ › | WSR 15 A Mtge ▾ | SFNS ▾ Related Functions Menu ▾ | | | Message ☆ ↻ ◑ ? |
|---|---|---|---|---|---|

90) Documents                              Structured Finance Notes
21) Related Parties
WSR 15
Underwriter
  Lead Manager     World Savings Bank

Servicer                              Trustee
  Master   World Savings Bank FSB          Bank of New York
                              Paying Agent

Originator/Seller          Deal%   Asset Manager

                              Swap Counterparty

## COMMENT SECTION PERTAINING TO TRUST INCLUDING CREDIT
## ENHANCEMENTS



**May further offset risks of owners or provide reimbursements to certain certificate holders**



‹ › WSR 15 A Mtge    DES    Related Functions Menu                    Message ★ ⫶ ❖ ?

| Page

**Bloomberg**                COMMENTS: WSR 15                Page 3 of 3

CALL FEATURE:  10% Deal Cleanup
MASTER SERVICER:  World Savings Bank, FSB.
ORIGINAL COLLATERAL CHARACTERISTICS:
 TYPE: 30 year adjustable mortage loans.
 LTV: 67%
 GEO DIS (>5%): CA 63.63; NJ 17.28; MA 8.21.
                        Class: A
RESTRICTIONS: Rule 144A eligible.
                        NOTICE
THESE SECURITIES WILL NOT BE AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES
ACT OF 1933 AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES ABSENT
REGISTRATION OR AN APPLICABLE EXEMPTION FROM REGISTRATION REQUIREMENTS.

### VIEW ALL LOAN CLASSES SCREEN

This screen shows the three investment classes into which the trust was split.

‹ › WSR 15 A Mtge    VAC    Related Functions Menu                    Message ★ ⫶ ❖ ?

ᵂAC
‹Menu› for series list
  95) Options                                        View All Cl...   View All Classes
WSR 15 WORLD SAVINGS REMIC                                              3 Classes
Template  Agency

| CF Class | Orig(000) | Cpn | OWAL | Factor | Cusip | Description | Group Des |
|---|---|---|---|---|---|---|---|
| 1) Pd A | 7,415,813 | 4.000 | 3.44 | 0.0000 | 98153CAA0 | SEQ | ALL collateral |
| 2) Pd B | 410,903 | 9.075 | 14.69 | 0.0000 | 98153CAB8 | SUB, CSTR | ALL collateral |
| 3) Pd R | 0 | 0.000 | 0.00 | 0.0000 | 98153CAC6 | R | ALL collateral |

**LOAN LEVEL DETAIL OR COLLATERAL COMPOSITION INFORMATION PROVIDED
TO BLOOMBERG, LP**





## PROSPECTUS

No prospectus or related filings made with the SEC given stated private placement status;
nor submitted to Bloomberg,



LP

### RECENT INVESTOR STATEMENT EXTRACT AND BANK OF NEW YORK CORPORATE TRUSTEE CONTACT INFORMATION

Not provided to Bloomberg, LP



### RATINGS CHANGES

**The trust was not publicly rated**



< > WSR 15 A Mtge - RCHG - Related Functions Menu     Message ★ · □ ○ · ? ·

No ratings are recorded for this security
WSR 15 A Mtge                    J) Setup Alert                          Ratings History
CUSIP  98153CAA0                            Coupon        4⅛
CMO    SEQUENTIAL PAYER                     Maturity Date 4/20/2034
                                            Issue Date    4/07/2004
        No history available               Agencies
                                              Standard & Poors   Moody's    Other
                                              Fitch              DBRS
                                              KBRA               Morningstar
Agency                          Rating Type      Rating               Effective Date

**BLOOMBERG LAW SEARCH**



| ‹ › WSR 15 A Mtge | BBLS | Related Functions Menu | Message ★ ⬚ ✿ ? |
|---|---|---|---|

```
1) Search    2) Preferences   3) Save      4) Clear      9) Options    All Selected Back        Bloomberg Law Search
Content Searches  _____  Search Terms   World Savings REMIC Series 115              71) Search Operators
All Legal Content
Dockets                                       Exact Match    •  • All Keywords   ◦ Any Keywords  ◦ This Phrase
Bankruptcies                                  ⬚ Search the document titles only
Patents                          Date Range   All Dates  •
Laws
Regulations                      Court        Select Source (name or ? to Browse)
Company Filings                               7) Favorite Sources
Court Opinions                   Advanced Docket Search Options
                                  80) Individual Parties  \ 14 Parties by Ticker List \
Recent Searches                        Include • All of the following   ◦ Any of the following   ⬚ Exclude Subsidiaries
Saved Searches                         Role   Any   •        Party
Docket Alerts                     Selected Parties

                                  Docket Number  [                ]    Judge     [              ]

                                  Case Name      [                ]    Case Status  Include All       ▾

                                  Attorney/Firm  [                ]    Documents    Dockets Only       ▾

                                  Nature of Suit  Include   ▾  [                    ]      [ Lookup ]
                                  Selected Sources

                                       All US Docket sources will be incorporated in search
```

## BLOOMBERG LAW DOCKET SEARCH RESULTS

| ‹ › WSR 15 A Mtge | BBLS | Related Functions Menu | Message ★ ⬚ ✿ ? |
|---|---|---|---|

```
<Menu> to Return
<Narrow Search>    90) Save/Alert    91) Edit Search    92) Options         19 Search Results
Source Dockets    •    Type All Dockets    •    Date Range mm/dd/yyyy ▢ - mm/dd/yyyy ▢
Keywords:... X  Documents... X                                    ⬚ Show Keyword in Context
```

| | Date Case Name | Docket Number | Heat |
|---|---|---|---|
| 101) | 11/04/2016 Carranza et al v. Wells Fargo Bank, N.A. et al | 5:16-cv-06464 | ⬚ |
| 102) | 10/06/2016 Eduardo Carranza et al vs. Welll Fargo Bank, N.A. et al | 16CV300764 | ⬚ |
| 103) | 08/25/2016 Weaver v. Wells Fargo Bank, N.A. et al | 3:16-cv-04907 | ⬚ |
| 104) | 08/02/2016 Gano v. Wells Fargo Bank, N.A. et al | 4:16-cv-04358 | ⬚ |
| 105) | 05/17/2016 Aaron Brewer et al v. Wells Fargo Bank, N.A. et al | 4:16-cv-02664 | ⬚ |
| 106) | 05/17/2016 Aaron Brewer et al v. Wells Fargo Bank, N.A. et al | 3:16-cv-02664 | ⬚ |
| 107) | 05/13/2016 Genung v. Clear Recon Corporation et al | 2:16-cv-00692 | ⬚ |
| 108) | 02/29/2016 Susan Calimpusan, et al v. Wells Fargo Bank, N.A., et al | 16-55298 | ⬚ |
| 109) | 02/29/2016 Susan Calimpusan, et al v. Wells Fargo Bank, N.A., et al | 16-55303 | ⬚ |
| 110) | 10/29/2015 Susan Calimpusan, et al v. Wells Fargo Bank, N.A. et al | 2:15-cv-08452 | ⬚ |
| 111) | 07/31/2014 Alabastro v. Wells Fargo Bank, N.A. et al | 5:14-cv-03469 | ⬚ |
| 112) | 08/05/2013 Pugh, et al v. Wells Fargo Bank N.A., et al | 2:13-cv-01617 | ⬚ |
| 113) | 01/11/2013 Hernandez v. Wachovia Mortgage, et al | 2:13-cv-00054 | ⬚ |
| 114) | 12/28/2012 Singh v. Wells Fargo Bank, N.A. et al | 3:12-cv-06566 | ⬚ |
| 115) | 02/12/2010 DEED AND NOTE TRADERS, L.L.C. | 4:10-bk-03640 | ⬚ |
| 116) | 01/21/2005 American Business Financial Services, Inc., a Dela and William W. Robertson | 1:05-bk-10203 | ⬚ |
| 117) | 11/15/2002 Oakwood Homes Corporation | 1:02-bk-13396 | ⬚ |
| 118) | 01/22/2002 Kmart Corporation and Brock Sweeping, Inc. | 1:02-bk-02474 | ⬚ |
| 119) | 12/02/2001 Enron Creditors Recovery Corp., et al | 1:01-bk-16034 | ⬚ |

## CONCLUSION

## CHAIN OF TITLE



### ARROW LEGEND

PURPLE – MORTGAGE DOCUMENTS
BLUE  – SECURITIES CERTIFICATES
RED   – INVESTOR FUNDS
GREEN – BORROWER FUNDS

ξ For traditional lending prior to Securitization, the original Deed recording was usually the only recorded document in the Chain of Title. That is because banks kept the loans, and did not sell the



loan, hence, only the original recording being present in the banks name.

The advent of Securitization, especially through "Private Investors" and not Fannie Mae or Freddie Mac, involved an entirely new process in mortgage lending. With Securitization, the Notes and Deeds were sold once, twice, three times or more. Using the traditional model would involve recording new Assignments of the Deed and Note as each transfer of the Note or Deed of Trust occurred. Obviously, this required time and money for each recording.

(The selling or transferring of the Note is not to be confused with the selling of Servicing Rights, which is simply the right to collect payment on the Note, and keep a small portion of the payment for Servicing Fees. Usually, when a homeowner states that their loan was sold, they are referring to Servicing Rights.)

ξ Securitizing a Loan

Securitizing a loan is the process of selling a loan to Wall Street and private investors. It is a method with many issues to be considered. The methodology of securitizing a loan generally followed these steps:

- A Wall Street firm would approach other entities about issuing a "Series of Bonds" for sale to investors and would come to an agreement. In other words, the Wall Street firm "pre-sold" the bonds.

- The Wall Street firm would approach a lender and usually offer them a warehouse Line of Credit. The Warehouse Credit Line would be used to fund the loan. The Warehouse Line would be covered by restrictions resulting from the initial Pooling & Servicing Agreement Guidelines and Mortgage Loan Purchase Agreement. These documents outlined the procedures for the creation of the loans and the administering of the loans prior to, and after, the sale of the loans to Wall Street.

- The Lender, with the guidelines, essentially went out and found "buyers" for the loans, people who fit the general characteristics of the Purchase Agreement. (Guidelines were very general and most people could qualify." The Lender would execute the loan and fund it, collecting payments until there were enough loans funded to sell to the Wall Street firm who could then issue the bonds.

- Once the necessary loans were funded, the lender would then sell the loans to the "Sponsor", usually either a subsidiary of the Wall Street firm, of a specially created Corporation of the lender. At this point, the loans are separated into "tranches" of loans, where they will be eventually turned into bonds.

- Next, the loans were "sold" to the "Depositor." This was a "Special Purpose Vehicle" designed with one purpose in mind. That was to create a "bankruptcy remote vehicle" where the lender or other entities are protected from what might happen to the loans, and/or the loans are "protected" from the lender. The "Depositor" would be, once again, created by the Wall Street firm or the lender.



- Then the "Depositor" would place the loans into the Issuing Entity, which is another entity created solely for the purpose of selling the bonds.

- Finally, the bonds would be sold, with a Trustee appointed to ensure that the bondholders received their monthly payments.

ξ WORLD SAVINGS BANK, FSB was a "correspondent lender" that originated mortgage loans. These loans, in turn, may have been sold and transferred into a "federally-approved securitization" trust named the WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST.

ξ The Note and Deed have taken two distinctly different paths. The Note may have been securitized into the WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST.

ξ The loan was originally made to WORLD SAVINGS BANK, FSB and may have been sold and transferred to WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST. There is no record of Assignments to either the Sponsor or Depositor as required by the Pooling and Servicing Agreement.

## Securitization Summary

1. Generally, if the Mortgage and the Note are not together with the same entity, there can be no legal enforcement of the Note. The Mortgage enforces the Note and provides the capability for the lender to foreclose on the property. Thus, if the Mortgage and the Note are separated, foreclosure legally cannot occur. The Note cannot be enforced by the Mortgage if each contains a different mortgagee/beneficiary; and, if the Mortgage is not itself a legally enforceable instrument, there can be no valid foreclosure on the homeowners' property.

2. In the event that the loan was sold, pooled and turned into a security, such event would indicate that the alleged holder can no longer claim that it is a real party of interest, as the original lender has been paid in full.

3. Further said, once the Note was converted into a stock, or stock equivalent, that event would indicate that the Note is no longer a Note. If both the Note and the stock, or stock equivalent, exist at the same time, that is known as double dipping. Double dipping is a form of securities fraud.

4. Once a loan has been securitized, which the aforementioned loan may have been done many times, that event would indicate that the loan forever loses its security component (i.e., the Mortgage), and the right to foreclose through the Mortgage is forever lost.

5. The findings of this report indicate that the Promissory Note has been converted into a stock as a permanent fixture. As a stock it is governed as a stock under the rules and regulations of the SEC; hence, the



requirement for the filings of the registration statements, pooling and servicing agreements, form 424B-5, et.al. There is no evidence on Record to indicate that the Mortgage was ever transferred concurrently with the purported legal transfer of the Note, such that the Mortgage and Note has been irrevocably separated, thus making a nullity out of the purported security in a property, as claimed.

6.   Careful review and examination reveals that this was a securitized loan. Any Assignment of Mortgage pretended to be an A to D transaction when in fact the foreclosing party was hiding the A to B, B to C, and C to D facts of true sales, where A is the original lender, B the sponsor/seller, C the bankruptcy-remote depositor, and D, the issuing mortgage-backed securities trust. They also hid the legal SEC filings, governing the transaction according to our findings. But to be controlled by those SEC filings, the true original loan Note and Mortgage had to be provided by the Document Custodian certified to have been in possession of them by them on or about January 31, 2006. Because it was not, the claim of ownership by the Trust cannot be substantiated and the loan servicing rights not established at law by agreement. Examiner supplies this report as written testimony and is available for oral testimony.

## DISCLAIMER

This report was based exclusively on the documentation provided. It also required that we make reasonable assumptions respecting disclosures and certain loan terms that, if erroneous, may result in material differences between our findings and the loan's actual compliance with applicable regulatory requirements. While we believe that our assumptions provide a reasonable basis for the review results, we make no representations or warranties respecting the appropriateness of our assumptions, the completeness of the information considered, or the accuracy of the findings. The contents of this report are being provided with the understanding that we are not providing legal advice, nor do we have any relationship, contractual or otherwise, with anyone other than the recipient. We do not, in providing this report, accept or assume responsibility for any other purpose.

## AFFIDAVIT OF FACTS



**STATE OF CALIFORNIA**   )
                               ) **sv.: AFFIDAVIT**
**COUNTY OF LOS ANGELES**  )

### RE: Yuriy B. Mankovskiy

I, MICHAEL CARRIGAN, a citizen of the United States and the State of California over the age of 21 years, and declare as follows, under penalty of perjury that the facts stated herein are true, correct and complete. The undersigned believes them to be true and admissible as evidence in a court of law, and if called upon as a witness, will testify as stated herein:

1. That I am a subscriber of the Bloomberg Professional Service, certified and licensed to use such service. I have completed the required training and engaged in continuing education with Bloomberg – both online and at Bloomberg live training events, to stay abreast with Bloomberg's latest progress and developments. I have the requisite knowledge and the trained ability to navigate and perform effective searches on the Bloomberg terminal.

2. I am a Certified Mortgage Securitization Auditor and my qualifications, expertise and experience provide me with the background necessary to certify the audit services and to be qualified as an expert in this field. I have produced approximately four thousand three hundred Securitized Analysis Reports in residential and commercial real estate mortgage investigation in 50 states, the District of Columbia and Puerto Rico, have testified as an expert witness, and have trained auditors in California, Florida, Georgia, Nevada, New York, New Jersey and Virginia and via the Internet in webinar format. I have a Bachelor's degree with a concentration in Accounting in Business Administration from California State University, Fullerton; a Master's in Business Administration from the UCLA Anderson School of Management; and have had formal training and career experience in accounting; financial reporting; internal control; SEC reporting; financial planning and analysis; financial forecasting; initial public and secondary offerings; corporate tax; corporate finance; investment management; equity, fixed income and derivative securities; credit analysis; asset valuation; ethics; investment advisory services including Series 7 and 66 licensing; real estate investment; real estate finance; real estate principles; redevelopment; government accounting; and procurement.

3. I have the trained skills and qualifications to navigate and perform searches on the Bloomberg terminal in regards to the automated tracking and determination of mortgage and loan related documents and information.

4. The contents of this report are factual, but it is provided for information purposes only and is not to be construed as "legal advice."[1]

[1] The client has been strongly advised to seek legal consultation from a competent legal professional in connection with the contents of this report and how to properly use it.

5. On April 3, 2017, I researched the Bloomberg online Database at the request of YURIY B. MANKOVSKIY whose property address is 75 Brook Farm Road, West Roxbury, MA 02132.



6.    Based on the information I was provided, YURIY B. MANKOVSKIY signed a Promissory Note in favor of World Savings Bank, FSB on March 8, 2004.

7.    Loan level detail was not identified in any publicly reporting trust. A trust meeting the qualifications for securitization is identified as the WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST with the Master Servicer being World Savings Bank, FSB; the Sponsor / Seller being World Savings Bank, FSB and the Depositor to be determined.

8.    The basis of the identification of Loan in WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST was made from the following factors/information that exactly correspond with YURIY B. MANKOVSKIY'S loan documents provided: Loan Number: 0023597610; Original Amount: $262,000.00; Origination Date: March 8, 2004; Location of Property: MA; Property Type: Single Family Residence; Occupancy: Owner Occupied; Zip Code: 02132; Type Loan: 30 Year Adjustable Rate Mortgage using negative amortization subject to a cap of 125% of principal.

By:

_____

Michael Carrigan
Certified Mortgage Securitization Auditor / Bloomberg Specialist

**RE: Yuriy B. Mankovskiy report dated April 4, 2017**



## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

> A Notary public or other completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**STATE OF CALIFORNIA**      )
                             ) sv.: **AFFIDAVIT**
**COUNTY OF LOS ANGELES**    )


On _____, 2017 before me, _____
                                                (Notary Public)

personally appeared **Michael Carrigan,** who proved to me on the basis of satisfactory evidence to be the man whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____ (Seal)


My commission Expires _____

# Exhibit H



# AFFIDAVIT OF FACTS

STATE OF CALIFORNIA )
) sv.: AFFIDAVIT
COUNTY OF LOS ANGELES )

RE: Yuriy B. Mankovskiy

I, MICHAEL CARRIGAN, a citizen of the United States and the State of California over the age of 21 years, and declare as follows, under penalty of perjury that the facts stated herein are true, correct and complete. The undersigned believes them to be true and admissible as evidence in a court of law, and if called upon as a witness, will testify as stated herein:

1. That I am a subscriber of the Bloomberg Professional Service, certified and licensed to use such service. I have completed the required training and engaged in continuing education with Bloomberg – both online and at Bloomberg live training events, to stay abreast with Bloomberg's latest progress and developments. I have the requisite knowledge and the trained ability to navigate and perform effective searches on the Bloomberg terminal.

2. I am a Certified Mortgage Securitization Auditor and my qualifications, expertise and experience provide me with the background necessary to certify the audit services and to be qualified as an expert in this field. I have produced approximately four thousand three hundred Securitized Analysis Reports in residential and commercial real estate mortgage investigation in 50 states, the District of Columbia and Puerto Rico, have testified as an expert witness, and have trained auditors in California, Florida, Georgia, Nevada, New York, New Jersey and Virginia and via the Internet in webinar format. I have a Bachelor's degree with a concentration in Accounting in Business Administration from California State University, Fullerton; a Master's in Business Administration from the UCLA Anderson School of Management; and have had formal training and career experience in accounting; financial reporting; internal control; SEC reporting; financial planning and analysis; financial forecasting; initial public and secondary offerings; corporate tax; corporate finance; investment management; equity, fixed income and derivative securities; credit analysis; asset valuation; ethics; investment advisory services including Series 7 and 66 licensing; real estate investment; real estate finance; real estate principles; redevelopment; government accounting; and procurement.

3. I have the trained skills and qualifications to navigate and perform searches on the Bloomberg terminal in regards to the automated tracking and determination of mortgage and loan related documents and information.

4. The contents of this report are factual, but it is provided for information purposes only and is not to be construed as "legal advice."[1]

---

[1] The client has been strongly advised to seek legal consultation from a competent legal professional in connection with the contents of this report and how to properly use it.



5.  On April 3, 2017, I researched the Bloomberg online Database at the request of YURIY B. MANKOVSKIY whose property address is 75 Brook Farm Road, West Roxbury, MA 02132.

6.  Based on the information I was provided, YURIY B. MANKOVSKIY signed a Promissory Note in favor of World Savings Bank, FSB on March 8, 2004.

7.  Loan level detail was not identified in any publicly reporting trust. A trust meeting the qualifications for securitization is identified as the WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST with the Master Servicer being World Savings Bank, FSB; the Sponsor / Seller being World Savings Bank, FSB and the Depositor to be determined.

8.  The basis of the identification of Loan in WORLD SAVINGS BANK MORTGAGE PASS-THROUGH CERTIFICATES REMIC 15 TRUST was made from the following factors/information that exactly correspond with YURIY B. MANKOVSKIY'S loan documents provided: Loan Number: 0023597610; Original Amount: $262,000.00; Origination Date: March 8, 2004; Location of Property: MA; Property Type: Single Family Residence; Occupancy: Owner Occupied; Zip Code: 02132; Type Loan: 30 Year Adjustable Rate Mortgage using negative amortization subject to a cap of 125% of principal.

By:

Michael Carrigan
Certified Mortgage Securitization Auditor / Bloomberg Specialist



RE: Yuriy B. Mankovskiy report dated April 4, 2017

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

A Notary public or other completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA          )
                             ) sv.: AFFIDAVIT
COUNTY OF LOS ANGELES   )

On Apri l 07ᵗʰ , 2017 before me, ___Luis Enrique Ramos___
                                              (Notary Public)

personally appeared **Michael Carrigan**, who proved to me on the basis of satisfactory evidence to be the man whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

My commission Expires  April 28, 2020

LUIS ENRIQUE RAMOS
COMM. # 2150948
NOTARY PUBLIC-CALIFORNIA
COUNTY OF LOS ANGELES
My Comm. Exp. April 28, 2020